| | |
|---|---|
| UNITED STATES FEDERAL DISTRICT COURT FOR THE DISTRICT OF COLORADO<br>901 19th Street, Denver, Colorado 80294 | FILED<br>U.S. DISTRICT COURT<br>DISTRICT OF COLORADO<br><br>25 JAN 22 AM 10: 46 |
| Plaintiffs:<br><br>**KATIE JOHNSON,** *PRO SE*<br>**JESSICA BUSBY,** *PRO SE*<br>**ET AL.**<br><br>v.<br><br>Defendants:<br><br>**ABACUS CAPITAL GROUP, LLC**<br>**AMFP V CENTRAL PARK, LLC**<br>**MICHAEL SARNO**<br>**SAKO AND PARTNERS LOWER HOLDINGS, LLC**<br>**ASSET LIVING, LLC**<br>**MICHAEL S. MCGRATH**<br>**M. RYAN MCGRATH**<br>**SHANNA MARTINEZ** | ▲COURT USE ONLY▲ |
| Party w/o Attorney:<br><br>Katie Johnson, *Pro Se*<br>7738 E. 25th Ave.<br>Denver, CO 80238<br>Phone Number: 970-424-3399<br>Email: Katiemail82@gmail.com<br><br>Jessica Busby, *Pro Se*<br>3227 Syracuse St. #203<br>Denver, CO 80238<br>Phone Number: 720-329-6569<br>E-mail: BusbyJessica296@gmail.com | **Case No.:**<br><br><br>**Division:** |
| COMPLAINT OF SEVERE VIOLATIONS OF COLORADO'S WARRANTY OF HABITABILITY PURSUANT TO C.R.S. §§ 38-12-501; LEASE AGREEMENTS; PROHIBITIONS AGAINST RETALIATION; THE COLORADO CARES ACT (HOUSE BILLS 23-1095 AND 23-1254); THE FAIR HOUSING AMENDMENTS ACT (FHAA); THE AMERICANS WITH DISABILITIES ACT (ADA); THE COLORADO CONSUMER PROTECTION ACT; GROSS AND CRIMINAL NEGLIGENCE THROUGH THE PREMISES LIABILITY ACT; AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, ET AL. | |

## I.    **INTRODUCTION**

1. This complaint challenges abusive practices, severe habitability, safety, health concerns, and rampant unchecked violations of Federal, State, and Municipal law experienced by Ms. Katie Johnson, Ms. Jessica Busby, representing themselves *Pro Se*, and other potential plaintiffs who

experienced these conditions while residing at The Avantus Apartments ("The Property"), which was grossly, willfully, and illegally mismanaged by the owners Abacus Capital Group, LLC; AMFPV Central Park, LLC; Michael Sarno ("Owners"); and their property managers Sako and Partners Lower Holdings, LLC; Asset Living, LLC; Michael S. Mcgrath; M. Ryan Mcgrath; Shanna Martinez ("Managers"); or their subsidiaries / agents (collectively "Defendants") during the period from which they began managing the property through the Present.

2. This case will show the abusive and cancerous practices by owners and landlords who refused to maintain their property in a livable condition. Specifically, Defendants refused to make necessary repairs, including with respect to critical, featured amenities like elevators, heating, water, safety, etc. as required by Federal, State, and Municipal law and/or the Defendants' own form Lease Agreements. Despite knowing about the need for such repairs for years, Defendants refused to authorize and perform them, choosing instead to continue to falsely advertise to tenants, prospective and current alike, that such amenities were fully functioning and available all while continuing to raise rents while purposefully decreasing essential services.

3. Although Asset Living, LLC was terminated as the property manager, their gross and criminal negligence, alongside the owners' egregious failures to act, despite persistent notices of violations of the law, have caused significant and ongoing harm to the plaintiffs, which has not been remedied. The issues persist to the present day, despite the new manager, Sarah Fleming, taking steps to address them. However, Abacus Capital Group and the other Defendants have failed to provide the necessary resources and support to address the deadly serious conditions at the property, despite the ongoing lawsuit and overwhelming evidence of their wrongdoings. The property remains in such poor condition that it continues to fail city inspections, and administrative citations have continued to be be issued by multiple agencies as recently as November 21, 2024.

4. Plaintiffs, for their Amended Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by city officials, testimony from former employees and the Defendants themselves, city inspectors, CORA reports, and the Plaintiffs' own extensive and thorough evidentiary documentation.

## II.    **BACKGROUND**

5. At all times relevant to this Amended Complaint, Plaintiffs were tenants in a two-building, 900-unit, residential apartment complex (the "Property" or "Subject Property") located in the City and County of Denver at 1955 Ulster St., 1950 Trenton St., and 8008 Montview Blvd. Denver, Colorado, 80220.

6. The Property is owned by Abacus Capital Group, LLC; through AMFP V Central Park, LLC; and their registered agent, Michael Sarno. At all times relevant to this Amended Complaint, Owners had authorized and appointed co-Defendants Sako and Partners Lower Holdings, LLC; through Asset Living, LLC; and their owners Michael S. Mcgrath; M. Ryan Mcgrath; or managers such as Shanna Martinez ("Managers"); and or their subsidiaries / agents to act as its general agents to manage and act as landlords for the Property.

7. On information and belief, Abacus Capital and Asset Living declined to renew or otherwise terminated their management agreement in respect to the property in or around 2024, after several lawsuits were filed against them.

8. The Defendants solicit tenants such as the Plaintiffs and others who, before they move in, are often unable to personally visit the Property and are routinely taken on a carefully curated, and

unrepresentative propaganda "tour" and then shown "model" apartments when they do, with marketing materials that describe the Property as featuring, "newly renovated apartments … newly renovated resort-style pool, state-of-the-art fitness center …" and a "gated community" with secure entrances. Federal, State, and Municipal codes, coupled with lease agreements obligate the owners and their agents to maintain functioning heating, running water, elevators, on-site maintenance, and working laundry facilities. *See* ("Avantus Apartments Website Amenities" https://theavantusapartments.com/amenities/).

9. Defendants' representations concerning the Property were designed to inform the reasonable expectations and influence the decision-making of the Plaintiffs and others concerning the Property, the terms of the Lease, Defendants' performance under the Lease (particularly with respect to the condition, maintenance, and upkeep of the Subject Property), and to induce prospective tenants to lease Rental Units from the Defendants or to keep current residents living there.

10. Despite their representations, Defendants systematically and pervasively fail to ensure and maintain the condition of the Property's common areas, facilities, and residential apartments as required by applicable law and their contractual obligations to their tenants.

11. Defendants have also known for years that substantial repairs were required with respect to the plumbing, water, heat, elevators, habitability code violations, fire code violations, and security doors in both buildings. Despite this knowledge, they illegally, and willfully failed to properly fix the issues for years before actually authorizing the funds and performing maintenance after several lawsuits were filed in 2023 and 2024.

12. The issues go beyond habitability violations. Defendants' failure to perform in good faith harms tenants immediately when they move-in: tenants and Plaintiffs were routinely met with missing, malfunctioning, and/or insecure building doors, inoperative building elevators, "resort-style pools" that are actually scum ponds and not open for use, neglected out-of-service laundry facilities lived in by vagrants and filled with feces, drug paraphernalia, etc. and apartments that have not been cleaned or otherwise prepared before a tenant's move-in date, containing cockroach infestations, leaking ceilings, and worse. This does not include the rampant security, fire, and other safety violations; federal, state, and municipal violations, and severe threats to tenants' life and safety due to organized gangs using the property as a forward base of operations due to non-existent security.

13. Defendants' failure to honor their duties under the form Lease Agreements, legal obligations, and failure to perform in good faith continued throughout the tenants' lease terms. For example, Defendants would regularly close tenant maintenance requests without resolving the reported maintenance issues, and sometimes without having acted upon the request at all, as shown by City health inspection violation reports. Other times, Defendants responded superficially in a way that they know is insufficient to remedy the issue (e.g., providing tenants with buckets to catch water dripping from ceiling and walls or with heaters when subzero temperatures threaten the lives of tenants without hot or running water) or by scapegoating their own vendors (telling tenants that perpetually inoperable elevators are "out of their hands").

14. Defendants' lack of good faith and predatory practices also include assessing their tenants with illegal junk fees, like a $12.00 per month "Pest Control Service" charge (the "Pest Control Charge") for regularly scheduled, preventative pest control services despite not providing any such service. There is also evidence that Plaintiffs and others were billed $75.00 for "not being ready" when pest control didn't even show up. Plaintiffs were required to extensively prepare the apartment, in accordance with Defendants' requirements, for pest control who never came. Plaintiffs are also

charged approximately 10 other illegal junk fees such as: Administrative fees ($180.00; Trash services – doorstep ($22.00); Package services - registration ($30.00); Parking ($35.00); Real estate fee ($35.00); etc. for services they do not receive.

15. Defendants' failure to repair habitability, and legal defects persists even after tenants, governmental authorities, and others repeatedly notify Defendants of the severe and malignant issues. There are multiple CORA reports with Representatives from Denver Department of Public Health issuing Notices of Violations, Final Notices of Violations, and Last Notices of Violations. As a result of Defendants' widespread, long-term dereliction of their duties, the Subject Property is best characterized as an uninhabitable and dilapidated slum—in a condition that violates Colorado law, contradicts Defendants' marketing materials, and breaches Defendants' express and implied obligations under the form lease and the law.

16. Defendants compound these indignities by threatening tenants who seek to terminate their leases either prior to the end of their lease terms or at the end of their lease term but without having first provided sixty days advance written notice of their intent to do so with an early "Move-Out Fee", also sometimes referred to as a "Buy Out Fee" or "Insufficient Notice Fee" (collectively referred to as the "Move-Out Fee"), equal to almost two months' extra rent to exert pressure against tenants to either stay and continue paying rent, pay the (two months' rent equivalent) Move-Out Fee, or, best case scenario, sign a nondisclosure/waiver agreement that helps the Defendants conceal their shady business practices when tenants terminate a lease for uninhabitable conditions.

17. As such, the Defendants maintain and operate the Property in a condition that materially interferes with the life, health, and safety of the Property's tenants and renders the residences within the Property unfit for the purpose for which they were leased – human habitation. The Plaintiffs and countless others have suffered and continue to suffer severe damages as a result of the Defendants callous, reprehensible, willful, and malignant behaviors.

18. In bringing this action, Plaintiffs seek, on their own behalf and that of the thousands of families Defendants are oppressing, to enjoin Defendants from: 1) assessing, threatening to assess, collecting, or retaining the Move Out Fee, or pursuing other damages or recourse, related to tenants having terminated or subsequently terminating their lease prior to their lease end date; 2) continuing to maintain the Property in a decrepit, unsafe, unsanitary, bad faith manner, and/or uninhabitable condition in violation of their duties under law and contract; 3) demanding and collecting full price rent until such time as the Defendants comply with their legal and contractual obligations or retaining such rents for periods when the Property wasn't maintained in compliance with Defendants' legal and contractual obligations; 4) marketing or leasing apartments at the Property to new tenants until such time as the Property complies with Defendants' legal and contractual obligations; 5) assessing, collecting, or retaining the Pest Control Charge for periods of time when no pest control services were provided; 6) assessing, collecting, or retaining the Administrative Fee; and other illegal junk fees; 7) wrongfully withholding any portion of their tenants' security deposits to satisfy assessments of the unlawful Move-Out Fee; and 8) preventing the Defendants from owning or operating any property in the State of Colorado, or somehow revoke their licenses within the state.

19. As detailed further below, Plaintiffs seek an award of damages against Defendants for their numerous breaches of their legal and contractual duties (including without limitation damages from the charging of the Pest Control Charge and failure to maintain the premises, ADA violations, Statutory violations, etc.); the assessment and collection of unlawful penalties, the Move-Out Fee; the wrongful retention of any portion of their tenants' security deposits to satisfy Move-Out Fee assessments; and the assessment and collection of the Administrative Fee and or other illegal junk

fees in violation of the Colorado Rental Application Fairness Act; as well as reasonable attorneys' fees and costs, pre and post-judgment interest, compensatory damages for physical, mental, and emotional anguish, punitive and exemplary damages to deter Defendants and, more importantly, others like them, statutory and treble damages, and any such other additional relief that is necessary and just.

### III.    PARTIES

20. At all times relevant, Plaintiffs were residents of the City and County of Denver, Colorado, who occupied and leased apartment units at the Subject Property, The Avantus Apartments, from the Defendants. Plaintiffs paid all amounts alleged to be owed under the lease contract and did so to preserve their leasehold interests under the threat of illegal eviction and related filings and proceedings. Plaintiffs have been subjected to Defendants' practice of leasing dilapidated apartments that fall far short of Defendants' shared duty as owners and operators to maintain the Property in compliance with their obligations under the law and form lease agreements.

22. The named Plaintiffs Ms. Johnson and Ms. Busby moved out of the Property on November 15th, 2023, and December 31st, 2022, respectively but were assessed the Move-Out Fees, junk fees, pest control charges, had their deposits wrongfully stolen, and other illegal charges by the Defendants.

27. Plaintiff: Katie Johnson, *Pro Se*
   - Address: 7738 E. 25th Ave. Denver, CO 80238
   - Phone: 970-424-3399, E-mail: KatieMail82@gmail.com

28. Plaintiff: Jessica Busby, *Pro Se*
   - Address: 3227 Syracuse St. #203 Denver, CO 80238
   - Phone: 720-329-6569, E-mail: BusbyJessica296@gmail.com

29. Defendant: Abacus Capital Group, LLC ("Abacus" or ACG) is a Colorado limited liability company with its principal office at 999 18th St., Suite 925N, Denver, CO 80202 and NY HQ listed as 100 Park Avenue Suite 3500, New York, NY 10017. Abacus Capital Group, LLC does business under the trade name Abacus Capital Group, LLC (https://www.abacuscapitalgroup.com/contact-us/). Abacus is a real estate investment company with a large concentration of assets in Colorado numbering well into the thousands. Abacus owns, operates, and otherwise reaches out to conduct business in Denver, Colorado and other jurisdictions through its more than 35,000 residential dwelling units in thirty-seven states. Plaintiffs signed leases with AMFP V Central Park, LLC and Abacus Multi-Family Planning GP LLC, a subsidiary of ACG according to ACG's SEC Government filings. Specifically, Form ADV. Additionally, The Avantus is listed on ACG's, not AMFPV's, website in the portfolio section exemplifying ACG's "pride in their work" at The Avantus. (https://www.abacuscapitalgroup.com/property/the-avantus-apartments/) ACG shares an officer with AMFP V: Michael Sarno. (Colorado Secretary of State, Date and Time: 04/30/2022 12:50 PM, ID Number: 20151310327, Document number: 20221448823)

30. Defendant: AMFP V Central Park, LLC is ACG's Colorado based section of the larger AMFP V property acquisition and value-add fund. (detailed multiple times at https://adviserinfo.sec.gov/firm/summary/157243). AMFP V has two addresses in CO, one as ACG at 999 18th St., Suite 925N, Denver, CO 80202 and one as AMFP V LLC at 1900 W Littleton Blvd, Littleton, CO 80120. AMFP V has ACG manager Michael "Mike" Sarno listed as agent. As such ACG has a level of direct control of AMFP's direction and actions. This is detailed the aforementioned SEC filings under form ADV and Part 2 Brochure. Michael Sarno is also a

Manager at ACG and principal managing officer for AMFP V showing the clear relationship between ACG's direct management of AMFP V.

31. Defendant: Michael Sarno is the managing officer at ACG and principal managing officer of AMFP V Central Park, LLC according to SEC filings. These direct links within ACG's leadership ladder highlight Michael Sarno's direct involvement in managing AMFP V and his direct work at ACG. Mr. Sarno ACG is held liable through sharing direct leadership with AMFP V, as having the same management necessitates a combined knowledge and direction of an entity, and those positions cannot be easily separated, especially in Mr. Sarno's case of being management in both companies, his face plastered all over their websites, and his registration with multiple agencies as Principle and or Agent.
- Address: 1650 Monaco, Denver CO, 80220 / 999 18th St., Suite 925N Denver, CO, 80202
- Phone: 720-379-1800
- E-mail: Midwestacq@abacuscapitalgroup.com

32. Defendant: Asset Living, LLC is a Colorado Foreign LLC with a principal office address listed with the Colorado Secretary of State as 7600 E. Orchard Rd. #200N, Greenwood Village, CO 80111 and HQ address as 7600 E. Orchard Rd. #200N, Greenwood Village, CO 80111 and a HQ based address as Asset Living, LLC, 945 BUNKER HILL RD, FL 14. Houston, TX 77024 Asset Living LLC is related to Asset Plus LLC and the related companies (Asset et Asset(s)) are owned by Sako and Partners Lower Holdings LLC, a NY based firm whose existence and relation to Asset et Assets is from filings in Texas and Florida. Asset living acquired The Avantus's previous management entity Echelon Property, LLC in January of 2020 (https://www.assetliving.com/blogs/asset-living-acquires-denver-based-echelon-property-group). Asset is/was under Asset Plus LLC and Asset Living, LLC. Asset's important members include M. Ryan Mcgrath (COO and Principal) and his father Asset Plus's Founder and Asset Living CEO Michael S. Mcgrath.

33. Defendant: Sako and Partners Lower Holdings, LLC is a management firm under Asset Living (Formerly Asset Plus) otherwise listed or know as Asset Multi. Details are obscured or hidden as Sako and Asset are privately held companies without SEC requirements to file. Since Sako owns and directs Asset as well as having the same manager, M. Ryan McGrath, this indicates that Sako cannot have been totally unaware of Asset's actions. The Business address according to Florida and Colorado filings is Sako and Partners Lower Holdings, LLC, 945 BUNKER HILL RD, FL 14. Houston, TX 77024 which is the same HQ address as Asset Living.

34. Defendant: Michael S. Mcgrath the Founder, CEO, and Owner of Asset Living LLC (formerly founded as Asset Plus in the 1980s) and gives orders directly to his son who follows unquestioningly, even though the directions are illegal and immoral. Mcgrath is a key person in Asset Living's management and dsaily operations and is therefore responsible for Asset's actions at their various managed properties and through their various shell entities which Mcgrath has struggled mightily, though sloppily, to obfuscate.
Address: 514 Lindenwood Dr. Houston, TX 77024

35. Defendant: M. Ryan Mcgrath is COO, son, and Principal of Asset Living (formerly Asset Plus). His positions, given by his father, grant direct oversight over the operational procedures of Asset and its subsidiaries, and as such, Standard Operating Procedures (SOPs) would be enacted by him and his father. His directions were given to and directed towards the managers like Shanna Martinez, and as such he, and his papa, should be held responsible for permitting such behavior in their own company. Defendants put on a face of goodwill, morality, and smiles; all to hide the predators they truly are. Mcgrath was emailed directly about the formal notices of habitability violations sent by the Plaintiffs.

Address: 281 Bryn Mawr Cir. Houston, TX 77024

36. Defendant: Shanna Martinez is the manager working for Asset Living and was formerly head manager at The Avantus during the time in which Asset Living was responsible for the property. Through her actions and inaction, the apartment complex was allowed to deteriorate to legally uninhabitable levels, although tenants were still living in such conditions. She has, on record, remarked on her ability to edit the rental ledger, to doing so with Plaintiffs' ledgers, and to "losing" tenant's rental agreements or leases due to the software, which she had used for 8 months, being "difficult to use." She also made statements to tenants about paying off City inspectors and officials, filed illegal evictions against tenants without cause, and willfully committed other illegal actions as former employees and multiple witnesses have and will testify to.
- Address: 56303 E. 24th Pl., Strasburg, CO 80136
- Phone: 303-802-0247

### III. JURISDICTION AND VENUE

37. Jurisdiction: This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the case arises under the laws of the United States, specifically 42 U.S.C. § 1983, and under 28 U.S.C. § 1367, which grants supplemental jurisdiction over related state law claims. This Court also has jurisdiction over Defendants pursuant to C.R.S. § 13-1-124(1)(a) and (c) because Defendants transact business and own, use, or possess real property situated in this state.

38. Venue: Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the City and County of Denver, Colorado, and the Defendants are subject to personal jurisdiction in this District. The residential lease between Plaintiffs and Defendants was entered into, set to be performed in, and concerns real property located within the City and County of Denver.

### IV. GENERAL ALLEGATIONS AND SUPPORTING FACTS

39. **Acquisition and Strategy of Decreasing Services while Increasing Rent:**
In January 2020, Michael S. Mcgrath, M. Ryan Mcgrath; and Shanna Martinez; through their entity Sako Partners Lower Holdings, LLC which owns, controls, and gives orders directly to Asset Living, LLC, a real-estate management firm, and Michael Sarno of Abacus Capital Group, LLC, a real estate owner, through their shell company AMFP V Central Park, LLC began grossly mismanaging Avantus Apartments at 8008 Montview Blvd., Denver, Colorado. The Defendants own filings prove that AMFP V Central Park, LLC is under control of Abacus Capital Group, that they share leadership staff, and even occupy the same physical location. The only distinguishing feature is that AMFP V Central Park, LLC is registered as a managed fund and Abacus Capital Group is an advisory company that runs AMFP V Central Park, LLC and similar funds as shells. In short, AMFP V Central Park, LLC is a different company in name only. AMFP V Central Park, LLC is closer to a department or special assignment than a separate and unrelated company; it's a shell directly owned and operated by Abacus. Plaintiffs provided Michael Sarno, Shanna Martinez, and the Mcgraths with multiple formal written notices of severe legal violations occurring on the property since they took over. These notices, along with multiple city citations have gone unheeded for more than two years. Notices of Legal Violations issued to the Defendants by the city are still outstanding to this day as well.

40. At all times relevant, through the structure laid out above, Michael S. Mcgrath, M. Ryan Mcgrath; and Shanna Martinez; through their entity Sako Partners Lower Holdings, LLC which owns, controls, and gives orders directly to Asset Living, LLC, a real-estate management firm, has acted as the general agent, property manager, and landlord of the Property (where Plaintiffs resided as tenants) on behalf of Defendant Abacus Capital Group, LLC, and Michael Sarno who directly

owned the property through their AMFP V Central Park, LLC shell. On information, testimony, and belief, the contract or other agreement between Asset Living, LLC and Abacus Capital terminated or otherwise ended sometime in 2024, however, Abacus Capital Group, Michael Sarno, and AMFP V Central Park have continued to violate the law to the present day as owners of the property.

41. All actions taken by Michael S. Mcgrath, M. Ryan Mcgrath; and Shanna Martinez, through Sako Partners Lower Holdings, and Asset Living, LLC set forth herein were on behalf of and for the benefit of themselves and as agents for their principals, Abacus Capital Group, AMFP V Central Park, and Michael Sarno, the property owners.

42. Defendants employed a standardized, uniform lease together with form addenda (referred to herein as the "Lease" or "Form Lease"that governed the Plaintiffs' lease agreements. On information and belief, the Defendants Asset Living, LLC used substantially the same Form Lease at other properties it managed on behalf of Abacus Capital Group.

43. Asset Living, LLC adopted common procedures and practices at the Subject Property, and at all the properties in Colorado under its management as it concerns allegations related to the unlawful junk fees, like the Pest Fees, Administrative Fees, and the Move-Out Fees.

44. The Form Lease is an adhesion contract that includes virtually identical provisions and is presented on a take-it or leave it, non-negotiable basis to Plaintiffs and others after they have sunk costs (like the $180.00 administrative fee) and time into pursuing a tenancy with Asset Living, LLC. Plaintiffs and others further enter into the Form Lease under the influence of the Defendants' overwhelmingly disparate bargaining power and in reliance on Asset Living's representations concerning the condition of the properties it manages—including the Subject Property specifically—and the rental terms concerning a prospective tenancy such as monthly amounts owed.

45. **The Defendants' Form Lease**
The Defendants contractual agreement with Plaintiffs and the others includes the following provisions, many of which are substantively unconscionable and therefore unenforceable, void as against public policy and therefore unenforceable, and are also indicative of the Defendants breached of implied covenants of good faith and fair dealing, making their conduct unlawful and unenforceable (*See* Exhibit 342):

46. ¶ 11 Early Moveout Fee: Requiring that Plaintiffs and others agree to pay the Move-Out Fee in an amount equal to almost two months' rent if they "move out without paying rent in full for the entire Lease Contract term…" or if they move out at the end of their lease term but without having first provided sixty days advance written notice of their intent to do so, and specifying that tenants "will not be released from liability on this Lease Contract for any reason whatsoever unless specifically released by us in writing." . *See* Exhibit 342 - Lease Agreement ¶11.

47. ¶ 26 Condition of the Property: Stating that tenants "will be given an Inventory and Condition form on or before move-in." and that "everything will be in a clean, safe, and good working condition" unless noted on the Inventory and Condition form, without any regard for the actual condition of the Property. *Id.,* ¶ 26.

48. ¶ 26 Purporting to disclaim the covenant of quiet enjoyment on behalf of the Defendants while requiring their tenants to adhere to it. Compare *Id.,* 4, ¶ 20 to *Id.,* 5, ¶ 26

49. ¶ 29 When Defendants May Enter: Requiring tenants to agree that the Defendants have the right to enter and access their apartments "at all reasonable times for any legitimate or necessary purpose which we determine in our sole discretion, including but not limited to, inspecting, providing necessary services, making necessary repairs or improvements…We shall always have the right to reenter the Premises without notice, with your consent or request…Absent consent or request from you, we may reenter with notice when practical, and without notice when impractical". *Id.,* ¶ 5, ¶ 29.

50. ¶ 32 Responsibilities of Owner: Stating that Defendants will "act with customary diligence" to: i. keep common areas reasonably clean." *Id.,* ¶ 32; ii. "maintain fixtures, furniture, hot water, heating and A/C equipment;" *Id.* iii. "comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing;" *Id.* iv. "make all reasonable repairs, subject to your obligation to pay for damages for which you are liable." *Id.*

51. ¶ 33 Default By resident: Stating that a tenant's failure to pay any and all rent or other amounts due is an event of default for which Defendants can pursue eviction and report to credit agencies. *Id.,* ¶ 33.

52. ¶ 33. Providing that the prevailing party in litigation concerning the Form Lease is entitled to an award of attorney's fees and costs. *Id.,* ¶ 33.

53. ¶ 33. Stating, in the negative, that it [landlord] has no duty to mitigate damages if a tenant terminates [their] lease early, such as the Move-Out Fee. *Id.,* ¶ 33.

54. ¶ 38 Miscellaneous: Stating that "All discretionary rights reserved for [Defendants] within this Lease Contract or any accompanying addenda are at our sole and absolute discretion." *Id.,* ¶ 38.

55. ¶ 39 Waiver of Jury Trial: Requiring tenants waive any right to a jury trial related to a dispute concerning the Form Lease. *Id.,* ¶ 39.

56. ¶ 49 Security Deposit Deductions: Stating that Defendants may deduct "any sums due under this Lease Contract", such as the Move-Out Fee, from a tenant's security deposit. *Id.,* ¶ 49.

57. Multiple Addendums also set forth responsibilities of the Defendants and attempt to impose unlawful restrictions on tenants. *See* Lease Addendums 3 (Bed Bugs); 4 (Class action Waiver); 6 (Crime Free); 8 (Marijuana); 9 (Mold); 10 (Package Acceptance); 11 (Parking); 12 (Pest Control); 13 (Gate Access); 17 (Utilities); 18 (Master Lease Addendum); 19 (Pets); 20 (Renters Insurance); and 21 (Tenants Rights). Defendants also incorporated "Addendums" into the Form Lease purportedly allowing Defendants to charge "preventative pest control services" (the Pest Control Charge), "move-out fees", and multiple junk fees.

58. The Defendants meet the Dictionary definition of "Slum Lords" and clearly meet the Denver Municipal Code's definition and prohibition of an illegal practice defined legally as "Slum Loading."

59. **Uninhabitable, Unsafe, and Illegal Conditions Persisted Under Gross Mismanagement:** During the period when Asset Living, LLC and other Defendants mismanaged the property, significant deterioration occurred. Plaintiffs experienced severe issues such as trash piled as high as 5' in common areas and left to fester for weeks, frequent water leaks within their units, mold growth, inadequate and non-existent heating, non-functioning and non-running water, pest infestations, non-functional elevators, and extreme safety concerns such as shootouts, break-ins,

vagrants living in units and storage areas or laundry rooms, no cleaning on the property for weeks or months, the presence of meth labs, organized gangs, chop-shops, SWAT responses, and the tragic deaths of multiple children on the property. The Plaintiffs also endured rampant fire, ADA, habitability, retaliation, and other legal violations committed by the Defendants. Despite numerous formal written complaints directly to the defendants Michael Sarno, the Mcgraths, and Martinez, multiple citations from city officials, and overwhelming evidence brought by the plaintiffs directly to each of the defendants, these issues were not resolved, creating, exacerbating, and festering dangerous and uninhabitable conditions for over two years to the present day.

60. The Plaintiffs put their safety at risk to thoroughly and extensively document violations after Defendants mistook their kindness for weakness or stupidity.

61. **Illegal Retaliation and Intimidation Against Residents Who Formalized Complaints:**
After Ms. Johnson, Ms. Busby, their neighbor Mr.. Haubernreiser, and other residents reported these issues, the Defendants, and their agents, including Shanna Martinez, engaged in retaliatory actions, such as filing illegal and unsubstantiated eviction notices (without pursuing any court hearings); withholding services; deliberately creating a hostile living environment by moving problem tenants next to plaintiffs and letting them run wild even after evidence was given to Defendants by plaintiffs of the neighbors' illegal conduct; illegally raising rent; changing rent and editing ledgers; breaching lease terms; illegally terminating leases or "losing documents", charging illegal junk and move out fees, and other illegal actions. Multiple witnesses will also testify that Ms. Martinez went so far as to openly claim she was paying off officers and inspectors and that nothing would be done about resident complaints. These actions violated multiple Federal, State, and Municipal laws.

62. The Defendants thought the little people would just go away because they didn't have the wherewithal or resources to do anything.

63. **Gross and Criminal Negligence and/or Wanton and Willful Misconduct:**
The conditions at Avantus Apartments were so dire that they constitute gross and criminal negligence on the part of Abacus Capital Group, LLC, AMFP V Central Park, LLC and Michael Sarno, Sako Partners Lower Holdings, LLC, Asset Living, LLC, the Mcgraths, Shanna Martinez, and their agents or subsidiaries. The failure to address repeated complaints about life-threatening conditions, break-ins, including shootings, organized criminal activity, open and notorious chop shops, non-functioning elevators, sewage leaks in units, rampant habitability violations, and the operation of meth labs, demonstrates a complete disregard for the safety and well-being of the residents or community. Despite receiving multiple citations and final notices from the City of Denver, the defendants failed to take the necessary actions to correct the violations. CORA reports prove these claims. Violations are outstanding to this day.

64. To the Defendants, a quick buck is more important than people.

65. **Abacus Capital Group's Consistent and Willful Failure to Act:**
Abacus Capital Group, AMFP V Central Park, and Michael Sarno, as the owner of the property, knew or should have known about the deplorable conditions and the plaintiffs' repeated complaints. Especially because plaintiffs and the city were sending formal written notices of violations almost weekly directly to Michal Sarno, Sako Partners Lower Holdings, Asset Living, the Mcgraths, and Shanna Martinez. Despite this knowledge, Abacus Capital and Michael Sarno did nothing to address these issues and has failed to provide Sarah Fleming, the current property manager, with the resources needed to remedy the situation presently. The ongoing neglect, callousness, and lack of support from Abacus Capital continue to endanger the lives of the residents.

66. It is abhorrent when a billion-dollar corporation actively endangers people's lives with no fear of retribution, even in the face of irrefutable evidence, to make more profit by decreasing services.

67. **CORA Reports and a Revolving Door of City Citations:**
CORA (Colorado Open Records Act) reports reveal a revolving door of multiple citations and final notices issued by the City of Denver against Avantus Apartments and the Defendants for violations related to health, safety, habitability, and rampant criminal activity. These citations include multiple and repeated failures to address leaks in plaintiffs units, sewage backups, pest infestations, structural hazards, extreme safety and security concerns, fire hazards, organized criminal activity using the property as a base of operations, an open, notorious, and verified chop shop on the property, bullet holes through apartments, pedophiles and individuals with active warrants living at the property with knowledge of management, human health hazards, and so much weapons activity/gunshots that the Denver Police Department put a Shot Spotter on the roof. Many departments including Police, Health inspectors, etc. were notified over and over, with nothing being done but more final notices being issued. SWAT has responded multiple times to the property; multiple children have died; and the property remains a blight on an otherwise beautiful neighborhood. The property has consistently failed to pass city habitability inspections, and re-inspections, leading to multiple administrative ciitations being issued due to the ongoing violations which continue to present day.

68. Defendants are not just endangering hundreds of thousands of tenants in their properties throughout the nation, they are destroying whole areas of Denver to profit off the most vulnerable and underserved people in our community. Parasites, of the most lothesome kind.

69. **Extreme Documentation Efforts and Illegal Retaliation:**
Ms. Johnson, Ms. Busby and their neighbor Mr. Haubenreiser, and other plaintiffs were forced to go to extreme lengths to document, report, and follow up on the numerous habitability issues at Avantus Apartments. Despite their persistence, they faced ongoing retaliation from management, including illegal filings of eviction, harassment, increased rent, and decreases in services. Their efforts to hold Asset Living accountable included creating detailed records, photographs, and video documentation, which were necessary to expose the severity of the neglect and mistreatment.

70. **Assaults and Criminal Activity Directly Attributable to Neglect and Mismanagement:**
Ms. Johnson, and Ms. Busby and their neighbor Mr. Haubenreiser all endured assaults, break-ins, and other severe criminal activity that was directly connected to the Defendants' grossly negligent mismanagement. Shanna Martinez, in her capacity as property manager, knowingly installed and housed tenants who engaged in criminal and disruptive behavior next to the plaintiffs. These tenants were placed directly adjacent to Ms. Johnson, Ms. Busby, Mr. Haubenreiser and other plaintiffs, leading to a toxic and unsafe environment with direct, credible, specific, and imminent threats to the plaintiffs' life and safety. The lack of security and failure to address repeated complaints about the criminal activity and these specific tenants, some with active warrants, which plaintiffs, present with management, had reported along with evidence to police, ultimately culminated in Plaintiffs being assaulted by the criminals living on the property with managements knowledge. Ms. Johnson was assaulted by her neighbor who had warrants for previous criminal activity, and also an assault on Ms. Johnson, multiple break-ins/car thefts, and other criminal activity; Mr. Haubenreiser also experienced multiple break-ins/car thefts, and suffered a brutally coordinated ambush, and assault on his life, resulting in serious injuries that required over a week of hospitalization for a broken jaw, a TBI, and a potential stroke; and Ms. Busby suffered multiple instances of car theft/break-ins and also had her unit broken into through the balcony and burglarized while her and her child were in the apartment sleeping. These assaults are a direct

consequence of the Defendants' willful or grossly negligent mismanagement decisions, particularly those made by Michael Sarno, the Mcgraths, and Shanna Martinez, who encouraged dangerous tenants to run wild, refused to address life threatening security concerns, specific and credible threats, and whose gross or criminal mismanagement jeopardized the safety of all residents in retaliation for the Plaintiffs formal complaints and escalating legal maneuvers.

71. After her tenure at the property was over and Asset Living, LLC was terminated as the manager (following the lawsuits) Shanna Martinez was promoted to regional manager for her unquestioning obedience as the agent of Michael Sarno, the Mcgraths, and their willful direction to violate multiple laws. Shanna Martinez previously testified to these facts.

72. **ADA Violations:**
Ms. Johnson, Ms. Busby, and their neighbor Mr. Haubenreiser have also been victims of the dangerous conditions fostered by the defendants' gross negligence or willful misconduct. Most notably regarding federally mandated ADA access rights. The property does not have reliably functioning elevators, does not have handicapped or ramp access to public sections of the buildings such as the leasing office, laundry rooms, common areas, garages, vehicle access, etc., has faulty fire exits, faulty fire systems, weekly fire alarms requiring fire department response, etc. Most recently, another resident Mr. Miller also suffered a severe head injury after falling due to unsafe conditions in a previously reported stairwell, because the elevators were down for months (again), which prompted plaintiff to file an insurance claim with the new property manager Sarah Fleming for violations of the Americans with Disabilities Act (ADA). Plaintiffs were and are unable to use elevators or access their units/vehicles because conveyances do not work and are unsafe to ride (according to city citations as recently as November 21st, 2024). The ongoing violations further underscore the defendants' failure to maintain a safe living environment, particularly for disabled tenants, especially after multiple, explicit, written notices, video evidence, etc. from plaintiffs, other tenants, and the City directly to Michael Sarno, the Mcgraths, and Shanna Martinez.

73. **All Elevators Out of Service:**
Under Michael Sarno and Shanna Martinez's mismanagement, there were periods when all elevators in the property were out of service for months at a time. This caused extreme hardship for residents, especially those with disabilities. Plaintiffs, including Ms. Johnson, Ms. Busby, their neighbor Mr. Haubenreiser, and other plaintiffs were forced to assist neighbors by carrying children in wheelchairs up and down flights of stairs for many weeks; being forced to take stairs after serious total knee replacement and other major surgeries; having no ability to get to dwellings or vehicles because of inaccessibility; inability to escape if there was a fire; etc. This situation highlights the defendants' willful misconduct or gross negligence in maintaining essential and legally mandated services for over two years, further endangering the lives and well-being of the tenants. This malicious, willful, and abhorrent conduct, particularly against disabled tenants., especially after multiple, explicit, written notices, video evidence, etc. from plaintiffs, the City, and other tenants constitutes gross and criminal negligence, especially considering that Defendants control Billions of dollars in assets.

74. **False Police Reports and Retaliatory Actions by Mismanagement:**
In a further attempt to intimidate and retaliate against the plaintiffs, Shanna Martinez filed false police reports accusing them of stalking her and threatening to vandalize her vehicle. In reality, it was other tenants who vandalized management and leasing agent vehicles after their desperate pleas for help with things like no heat (in sub-freezing temperatures), no water, and no maintenance went unaddressed even after many weeks. Martinez reported these incidents to the police, and the actual perpetrators were apprehended. These false accusations demonstrate the extent of the retaliatory tactics used by the defendants against the plaintiffs.

**75. Weekly Fire Alarms, Faulty Fire Systems, and Other Fire Code Violations**
The property suffered from weekly false alarms when the fire system faults triggered evacuation procedures. The false alarms were so frequent that if there was a real fire the loss of life would be catastrophic due to people ignoring the incessant alarms. Fire department must respond to each alarm, oftentimes two or three times a week at all hours of the day and night. This, coupled with the fact that there was no heat in the coldest months of winter, and rampant unchecked fire code violations like open flames on balconies, in units, and in common areas; either from people trying to keep warm, vagrants, or illegal grilling. Fire escape doors were routinely jammed, broken, and otherwise inaccessible. Coupled with the non-existent handicapped and ADA mandated accommodations for mobility impaired residents, the situation is a literal tinderbox just waiting for a spark. Plaintiffs themselves have had to put out fires which started in the garbage left in halls and common areas.

76. The Defendants' drain on fire department resources, as confirmed in CORA reports, is reprehensible. The Fire Department hates this property as confirmed by conversations with multiple firefighters, and their command structure.

**77. Violations of the Colorado Consumer Protection Act:**
Defendants knowingly misled individuals living at the property and touring the property as potential renters by lying about property conditions, amenities, rent values, etc. and illegally misrepresenting to tenants that things were being fixed, updated, renovated, improved, etc. Defendants engaged in deceptive trade practices, as testimony from former employees confirms, and the defendants' practices caused harm to Plaintiffs.

<u>**Facts Specific to Ms. Johnson**</u>
80. Throughout the period from approximately January 2021 through November 15th, 2023. Ms. Johnson has suffered harm and damages from violations committed by the Defendants as laid out in Claims I through XXXI. Several specific instances follow with a full list to be provided, containing exhibits, which Ms. Johnson will have compiled for discovery.

- February 4th, 2021, Plaintiff Johnson moved into the Avantus Apartment U444 under the impression that she would receive amenities, have working elevators, and a safe, habitable environment based on Defendants' false representations.
- Second Week of February 2021, Plaintiff's elevator, directly across the hall from Johnson's apartment, became inoperable for more than a week. Johnson went to the management office, but the manager was unavailable, so she submitted a work order and left a note for the Defendants. The issue with elevators being down for extended periods persisted pervasively throughout her tenancy.
- Starting noticeably around February 2021, Plaintiff Johnson's hall was filled with trash which began accumulating in the basement, overflowing in dumpsters, and was directly outside her door due to a trash chute which was locked by Defendants. The smell became unbearable and was noticeable from within the Plaintiff's unit. Despite weekly visits to the office and leaving several notes about the smell, roaches, and biohazards, the issue persisted. Photographic evidence was documented.
- Throughout 2021, conditions throughout the property continued to deteriorate while maintenance and services decreased; criminal activity skyrocketed due to less security and non-functioning exterior doors which Defendants failed to fix; habitability and other violations spiraled out of control; and city violations ramped up as tenants became slowly and painfully aware that they needed to protect themselves from the Defendants with documentation.

- Through 2022 Johnson continues to send written notices of Habitability to the Defendants which go unanswered, as severe safety violations escalate both within her unit and in common areas due to unchecked crime in the building which forces Johnson to document.
- June 8th, 2022, Plaintiff Johnson discovered her car had been broken into in the garage. She went to the office, but no one was available. She left a note requesting improved security and functioning gates / exterior doors and other measures since rampant crime and habitability violations plagued the property.
- August 19th, 2022, Plaintiff Johnson's car was broken into again in the garage. She went to the office and, finding no one available, left another note requesting security and habitability improvements and notifying Defendants of violations.
- September 5th, 2022, Plaintiff Johnson's storage unit was broken into, and items were stolen. She went to the office, waited for 20 minutes and was not helped by anyone. She left additional notes for management regarding the security and habitability concerns.
- October 2022, Plaintiff Johnson began to visit the office weekly to address broken elevators, habitability violations such as trash piled in her hallway, vagrants living around and within the property, broken gates, non-functioning locking mechanisms on exterior doors, rampant crime, including organized chop shops in the garage, and break-ins. She left written notes each time but received no responses.
- November 12th, 2022, Plaintiff Johnson's storage unit was broken into again, with more items stolen. She left more notes in the office reiterating her desperate security concerns and threats to her life and safety. The notes also addressed non-functioning elevators and persistent habitability concerns both within her unit and in all common areas.
- November 13th, 2022, Plaintiff Johnson's car was broken into and nearly stolen in the garage. She called the office and was told nothing could be done. After making an appointment to speak with management, she left another written note. She also contacted the police, who declined to respond due to the lack of personal injury.
- December 22nd-26th, 2022, Ms. Johnson's entire building was without water over Christmas. Plaintiff Johnson, who was with her 10-year-old son, could not clean, cook, or take care of daily necessities. Multiple maintenance requests were submitted, but no response was received. Heat was also out since it is tied to the water system. This was the coldest part of winter. Open flames and other fire hazards were occurring in units as people attempted to stay warm and this terrified Plaintiff Johnson because of the incessant fire alarms going off due to faulty fire systems (Plaintiffs saw red and orange lights blinking on the fire system panel), she never knew when a real fire emergency was occurring.
- March 10th, 2023, Plaintiff Johnson's car was broken into again in the garage. She went to the office but found no one available. She left another note begging for security measures and broken elevators to be fixed, along with a list of habitability issues in her unit and in common areas.
- April 9th, 2023, Plaintiff Johnson's storage unit was broken into again, with additional items stolen. She left more notes requesting Defendants to address security issues and habitability violations, citing the prioritization of aesthetic upgrades over safety measures. Unable to afford an expensive security apparatus to counter forced break-ins, Plaintiff Johnson's own efforts to better secure the unit failed.
- May 19th, 2023, Plaintiff Johnson underwent a total knee replacement, necessitated partly by the repeated need to climb four flights of stairs during elevator outages. Upon her return, the elevators remained non-functional for more than two weeks, preventing her from leaving her floor. Plaintiff Johnson continued to repeatedly give notices of these and other continued violations to Defendants.
- Starting July 2023, Persistent and terrifying cockroach infestations began in Plaintiff Johnson's unit directly due to the habitability violations with the trash piles in the halls and other common areas and no cleaning being done. Despite repeated notifications to Defendants and assurances

of extermination, the infestation continued until her move-out. She was forced to throw out food regularly due to contamination. She experienced several instances when pest control was billed to her even though no pest control ever showed up and she had gone out of her way extensively to prepare her apartment according to the Defendants requirements.

- October 2023, Plaintiff Johnson's storage unit was broken into again. She notified the Defendants again through more written notices of the legal violations.

- October 17th, 2023, Plaintiff Johnson recorded a video of a loud, shaking noise from the elevator near her apartment, which had been malfunctioning for more than two weeks and was unsafe to ride in. Plaintiff showed all her evidence to Defendants along with written notices of the violations as demanded by Defendants, only to continue to be ignored and then harassed by Defendants for her continued complaints.

- October 23rd, 2023, Plaintiff Johnson's neighbor engaged in disruptive and criminal behavior, screaming outside at all hours of the day and night, rampant domestic violence incidents, danger to Plaintiff Johnson's life and safety through credible, specific, and imminent threats, and eventually physical assaults. This was the third such incident since September 2023. After reporting it to Shanna Martinez in the office, Plaintiff Johnson was instructed to film the neighbor instead of the complex installing security cameras. Martinez proceeded to harass and retaliate against Plaintiff Johnson by installing criminal neighbors next to her and refusing to do anything about Plaintiff Johnsons written notices and escalating documentation, raising rent and decreasing services, and eventually wrongfully evicting Plaintiff Johnson and charging her illegal move-out fees.

- November 3rd, 2023, Plaintiff Johnson's neighbor attacked her after Plaintiff Johnson recorded more disruptive behavior. The neighbor seized Plaintiff Johnson's phone and fled. Shanna Martinez met Plaintiff Johnson in the office and summoned the police, who took a report. The stress caused Plaintiff Johnson to vomit multiple times. Shanna's only concern was that Plaintiff Johnson dispose of the trash after vomiting. This incident hastened Plaintiff Johnson's decision to move out, as it became clear her neighbor would not be evicted, and Shanna Martinez would continue to retaliate against Plaintiff Johnson for her complaints, notices, and documentation of violations.

- November 15th, 2023, Plaintiff Johnson is forced to move out when Defendants and Martinez refused to offer her a new lease in retaliation for Johnsons notices and documentation of illegal practices by Defendants. Defendants charged Plaintiff Johnson thousands of dollars in illegal move-out fees.

## Facts Specific to Ms. Busby

81. Throughout the period from approximately January 2020 through December 31st, 2022, Ms. Busby has suffered harm and damages from violations committed by the Defendants as laid out in Claims I through XXXI. Several specific instances follow with a full list to be provided, containing exhibits, which Ms. Busby will have compiled for discovery.

- January 2021, Plaintiff Busby began submitting handwritten notices of multiple safety, habitability and other violations of her lease agreement. Plaintiff Busby listed issues in her apartment and around her building in common areas, including:
  o Persistent fire alarms and non-functioning elevators.
  o Safety concerns in the parking garage due to no gates or functioning exterior locks.
  o Electrical problems in her kitchen including a non-functional oven.
  o Continued heating and water outages.
  o A dishwasher that did not work.
  o Severe habitability violations in the form of trash piling up in common areas and left to fester for days or weeks, vagrants living in and around the property and harassing residents,

and rapidly escalating organized criminal activity with gunshots, break-ins, chop shops in the garage, and other serious criminal activity.

- April 2021, Plaintiff's car was broken into while parked in the building's lot. The thieves left the car rolling with its doors open and the interior ransacked, likely because it was a manual transmission, and they could not drive it. Plaintiff Busby left multiple notes and other written notices, such as maintenance requests, with the Defendants demanding increased security and solutions to the habitability violations.
- Throughout 2021, conditions throughout the property continued to deteriorate while maintenance and services decreased; criminal activity skyrocketed due to less security and non-functioning exterior doors which Defendants failed to fix; habitability and other violations spiraled out of control; and city violations ramped up as tenants became slowly and painfully aware that they needed to protect themselves from the Defendants with documentation.
- June 2021, Plaintiff caught three individuals breaking into her car in the building's parking area. The car alarm was going off, and the individuals scattered when she arrived. She reported the incident to the police and notified management, in writing, the following day about the lack of security and other concerns about increasing criminal activity within the property, and again about the habitability issues within her unit and in common areas, and the persistently broken elevators. Plaintiff submitted another handwritten note to the office regarding the persistent fire alarms, which were going off a couple of times per week and violations of Denver fire code, like people using open flames within the property.
- July 2021, Trash continued piling up to extreme and unbelievable levels, not only in the chutes and dumpsters, but in common areas and right outside Plaintiff Busby's unit. This caused foul odors, pests, and other biohazards thar spread through hallways and into individual apartments, including Plaintiff Busby's.
- October 2021, Plaintiff submitted another service request for her non-functional oven, which had still not been repaired. These requests were canceled or falsely marked as "completed" by the Defendants.
- December 10th, 2021, Plaintiff's apartment was burglarized, while they slept, as criminals climbed in through her balcony. Plaintiff Busby believed the burglary was committed by tenants living in the building which she had previously reported to the Defendants. At the time, Plaintiff was recovering from major surgery, making it difficult to deal with the aftermath, especially with her mobility impairment, non-functioning elevators, and rampant security concerns.
  - o Both Plaintiff and her child were severely traumatized. Both her and her child were diagnosed with PTSD and needed to begin therapy.
  - o Plaintiff reported the burglary to management but received no assistance, but instead harassment and retaliation, for her continued notices of violations and documentation of Defendants illegal conduct.
  - o Police provided pathetically limited support (Case Number: 21-693918).
- Through 2022 Busby continues to send written notices of Habitability to the Defendants which go unanswered, as severe safety violations escalate both within her unit and in common areas due to unchecked crime in the building which forces Busby to document.
- September 2022, the hallway outside Plaintiff's apartment flooded. She notified the office manager when she picked up a package. The issue was temporarily "fixed" but flooded twice more, with Plaintiff reporting each occurrence to the office. These floodings damages Plaintiff Busby's unit and her belongings as well as made her unit uninhabitable. She gave written notices to Defendants of all these conditions and continued to face harassment and decreased services for her complaints and documentation.
- October 10th, 2022, Plaintiff discovered a significant leak under the linoleum in her child's bathroom. The floor was bubbling up from water trapped underneath.

- o Plaintiff called the office and left messages with the emergency maintenance line but received no response. She walked to the office and left a written complaint with the Defendants about the issue and continued to document habitability violations.
- o A maintenance worker identified the leak many hours later as originating from upstairs but took no action for three days.
- o Plaintiff repeatedly called and visited the office to demand action. The leak was eventually stopped, and water was vacuumed up. Heaters were set up overnight to dry the area and management assured Plaintiff it was not sewage (it was).
- October 11th, 2022, By the next night, the floors and carpets were soaked with sewage again. Plaintiff notified management, who returned to address the issue and dry the carpets but did an incomplete job, continuing to leave Plaintiff Busby's apartment uninhabitable.
- October 17th, 2022, While Plaintiff was out of town, her apartment flooded again. The third-party company hired to dry the apartment informed Plaintiff that the flooding did involve raw sewage. Plaintiff Busby notified Defendants of these continued habitability violations and Defendants continued to retaliate against her by refusing to act, decreasing services, and harassing Plaintiff Busby.
  - o Plaintiff's child became sick several times during this period due to the uninhabitable conditions within her unit and common areas.
  - o Plaintiff had to move her child into her own bedroom for several weeks because other rooms were uninhabitable due to the sewage and unfixed leaks.
  - o Two large heaters occupied significant space in her 900-square-foot apartment, further limiting their living area due to the consistent heat and water outages.
  - o Clothing and belongings stored in affected rooms were destroyed.
  - o Plaintiff cleaned the sewage herself using a steam cleaner and discovered black mold in her child's bathroom and bedroom.
  - o Despite these conditions, and multiple written notices begging for help and fixes to violations, management failed to clean the sewage or address the mold.
- December 31st, 2022, Plaintiff Busby submitted a Lease Termination Request to Defendants following the flooding incidents and Plaintiff Busby requested to be released from her lease due to violations of habitability and retaliation.
  - o Defendants and their agents refused and stated that breaking the lease early would cost an extra $3,620. All of Plaintiff's emails to management went unanswered for weeks, offering no timely solutions. Plaintiff Busby was charged illegal move-out fees in the thousands of dollars despite her continued habitability notices.
- Case Numbers
  a. Health Department: DPHE Case No. CE2265
  b. Police Reports: December 2021 Burglary: Case No. 21-693918

## VI. CLAIMS AND CAUSES OF ACTION

**82. CLAIM I: VIOLATIONS OF THE WARRANTY OF HABITABILITY (C.R.S. §§ 38-12-501 ET SEQ.)**

**Elements:** Under C.R.S. §§ 38-12-501 et seq., Plaintiffs must prove:
- A landlord-tenant relationship existed.
- The premises were uninhabitable.
- The uninhabitable condition materially interfered with Plaintiffs' use of the premises.
- Defendants failed to remedy the conditions within a reasonable time after receiving notice.

**Application:**
- Plaintiffs had valid leases with Defendants.
- Plaintiffs experienced uninhabitable conditions, including sewage backups, mold, pest infestations, and lack of heating or running water, security concerns, and other threats to

life and safety. These were all proven by CORA reports, extensive video evidence taken by plaintiffs, formal written notices of legal violations, etc.

- These conditions materially interfered with Plaintiffs' ability to safely reside on the premises.
- Defendants received numerous formal written complaints, notices of violations, and city citations but failed to remedy conditions. *See* C.R.S. § 38-12-503; Warne v. Hall, 373 P.3d 588 (Colo. 2016).

**Conclusion:**

- Defendants' systemic neglect and failure to remedy uninhabitable conditions within a reasonable timeframe, despite numerous complaints and documented evidence, constitute clear violations of the Warranty of Habitability as defined under C.R.S. §§ 38-12-501 et seq. Plaintiffs respectfully request that this Court award compensatory and statutory damages, along with injunctive relief, to ensure compliance with habitability standards and prevent future harm to tenants. Further, Plaintiffs seek any additional relief deemed just and proper to address Defendants' egregious conduct.

## 83. CLAIM II: VIOLATIONS OF THE FAIR HOUSING AMENDMENTS ACT (42 U.S.C. § 3604(F))

**Elements:** Under 42 U.S.C. § 3604(f), Plaintiffs must demonstrate:

- Plaintiffs were members of a protected class.
- Defendants discriminated in the terms, conditions, or privileges of rental or services.
- The discrimination was related to Plaintiffs' protected status.

**Application:**

- Plaintiffs Katie Johnson, and Jessica Busby are disabled and protected under the FHAA. Ms. Johnson had total knee replacement surgery during the time she resided at the property, Ms. Busby had total hip replacement surgery while residing at the property, and all the Plaintiffs had no elevator or other mobility challenged accommodations during this time of temporary disability despite formal written notices to management about the conditions.
- Ms. Johnson, and Ms. Busby all experienced extremely traumatic events while living the property which were directly attributable to the Defendants' conduct, resulting in or exacerbating existing medical conditions and disabilities like PTSD, as confirmed by Plaintiffs' doctors.
- Defendants failed to address accessibility issues, including non-functional elevators, which disproportionately affected disabled Plaintiffs.
- The discrimination was based on Plaintiffs' disabilities. *See Garcia v. Apts. Ltd.,* 998 F.3d 645, 649 (10th Cir. 2022). Defendants refused to address specific complaints or formal legal requests for accommodations from disabled Plaintiffs in a timely manner, demonstrating disparate treatment. This discrimination targeted Plaintiffs' protected status as individuals with disabilities in their retaliatory efforts to get Plaintiff to self-evict.

**Conclusion:**

- Defendants' actions, including failing to address accessibility issues, retaliating against disabled Plaintiffs, and refusing to accommodate requests for accessible living conditions, constitute clear violations of the Fair Housing Amendments Act (42 U.S.C. § 3604(f)). These discriminatory practices targeted Plaintiffs' protected status as individuals with disabilities, depriving them of their rights under federal law. Plaintiffs respectfully request that this Court award compensatory and punitive damages, injunctive relief requiring Defendants to implement accessibility measures, and attorneys' fees and costs incurred in

pursuing this action. Additionally, Plaintiffs seek any further relief deemed just and proper to address Defendants' violations and prevent future harm to disabled tenants.

84. **CLAIM III: VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101)**

**Elements:** Under 42 U.S.C. § 12182(b)(2)(A)(ii), Plaintiffs must show:
- Plaintiffs were qualified individuals with disabilities.
- Defendants owned, leased, or operated a place of public accommodation.
- Defendants failed to make reasonable accommodations for Plaintiffs' disabilities.

**Application:**
- Plaintiffs Katie Johnson, and Ms. Busby qualify as disabled under the ADA.
- Defendants failed to provide reasonable accommodations, such as by repairing elevators, ensuring ADA-compliant access, or abiding by Federal, State, and Municipal Law.
- This failure caused Plaintiffs significant hardship and was retaliatory in nature. *See Martin v. Colorado Housing, No.* 23-CV-3255 (D. Colo. 2024).

**Conclusion:**
- Defendants' failure to provide reasonable accommodations for Plaintiffs' disabilities, including repairing elevators and ensuring ADA-compliant access, constitutes a violation of the Americans with Disabilities Act (42 U.S.C. § 12101). These actions caused significant hardship and retaliation against Plaintiffs based on their protected status as individuals with disabilities. Plaintiffs respectfully request that this Court award compensatory and punitive damages, injunctive relief to require Defendants' compliance with ADA standards, and attorneys' fees and costs. Plaintiffs also seek any further relief deemed just and proper to address Defendants' violations and prevent future harm to disabled tenants.

85. **CLAIM IV: RETALIATION (C.R.S. §§ 38-12-509 ET SEQ.)**

**Elements:** Under C.R.S. § 38-12-509, Plaintiffs must prove:
- Plaintiffs exercised their rights under the Warranty of Habitability.
- Defendants took adverse actions against Plaintiffs.
- The adverse actions were retaliatory.

**Application:**
- Plaintiffs submitted many formal written complaints about habitability issues directly to Michael Sarno, the Mcgraths, Shanna Martinez, and city officials.
- Defendants retaliated by filing false police reports, threatening evictions, withholding essential services, changing rent, breaching lease agreements, editing payment ledgers, "losing leases", and installing dangerous and criminal tenants next to Plaintiffs and refusing to address Plaintiffs' documented evidence of criminal activity, harassment, or imminent, credible, specific, and targeted threats to Plaintiffs' life and safety from the individuals being complained about.
- The adverse actions were intended to silence Plaintiffs and force them to self-evict. *See* Colo. Rev. Stat. § 38-12-509.

**Conclusion:**
- Defendants' retaliatory actions, including false police reports, eviction threats, withholding essential services, and installing disruptive and dangerous tenants near Plaintiffs, constitute clear violations of C.R.S. § 38-12-509. These actions were intended to silence Plaintiffs and force them to self-evict, depriving them of their legal rights and protections under Colorado law. Plaintiffs respectfully request that this Court award compensatory and punitive damages, injunctive relief to prevent further retaliatory actions, and attorneys' fees and costs incurred in pursuing this action. Plaintiffs also seek any further relief deemed just

and equitable to address Defendants' misconduct and protect tenants from similar unlawful retaliation.

## 86. CLAIM V: VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (C.R.S. §§ 6-1-101 ET SEQ.)

**Elements:** Under CCPA, Plaintiffs must show:
- Defendants engaged in deceptive trade practices.
- Defendants' practices caused harm to Plaintiffs.

**Application:**
- Defendants misrepresented the condition of the apartments, amenities, security, and other critical habitability issues to prospective and current tenants through their affirmations and representations made publicly to current and prospective tenants.
- Plaintiffs and others relied on these misrepresentations and suffered harm, including financial loss and health issues. *See Martinez v. Affordable Hous. Network, Inc.,* 123 P.3d 1201 (Colo. 2005).

**Conclusion**
- Defendants' deceptive trade practices, including misrepresentations about the condition of the apartments, amenities, security, and habitability, directly violated the Colorado Consumer Protection Act (C.R.S. §§ 6-1-101 et seq.). These misrepresentations caused Plaintiffs to suffer financial losses, health issues, and emotional distress as they relied on false assurances and promises made by Defendants. Plaintiffs respectfully request that this Court award compensatory and punitive damages, statutory damages under the CCPA, injunctive relief to prevent further deceptive practices, and attorneys' fees and costs incurred in bringing this action. Plaintiffs further seek any other relief deemed just and proper to address Defendants' violations and deter future harm to tenants and consumers.

## 87. CLAIM VI: GROSS NEGLIGENCE THROUGH THE PREMISES LIABILITY ACT (C.R.S. § 13-21-115)

**Elements:** Under C.R.S. § 13-21-115, Plaintiffs must demonstrate:
- Defendants owed a duty of care to Plaintiffs as tenants and lawful visitors to the property.
- Defendants breached this duty through gross negligence, which involves reckless disregard or willful indifference to tenant safety.
- The breach directly caused Plaintiffs' injuries or damages.

**Application:**
- **Duty of Care:** Defendants, as property owners and managers, owed a statutory duty to maintain the Property in a reasonably safe condition, ensuring that tenants and their guests were not exposed to foreseeable harm. *See Springer v. City & County of Denver,* 13 P.3d 794, 799 (Colo. 2000).
- **Breach of Duty:** Defendants acted with gross negligence by:
  - o Allowing rampant criminal activity, including assaults and theft, to persist despite repeated complaints from Plaintiffs and other tenants.
  - o Ignoring maintenance of critical infrastructure, including non-functional elevators, inadequate lighting in common areas, and broken locks, creating unsafe conditions.
  - o Failing to address known hazards, such as mold infestations, sewage backups, and pest control issues, which posed significant health risks.

For example, Plaintiffs Katie Johnson, and Jessica Busby were all assaulted, threatened and otherwise terrorized due to inadequate security measures and lack of functioning locks in the building and rampant organized criminal activity on the premises. Defendants had been notified of these severe safety issues multiple times, even filing police reports with the Plaintiffs, but then failed to act further in accordance with the law and lease agreements, demonstrating willful indifference to tenant safety.

- **Causation and Damages:** The unsafe conditions directly caused Plaintiffs to suffer physical injuries, emotional distress, and financial harm. Plaintiffs Katie Johnson, and Jessica Busby for instance, experienced exacerbated PTSD and other medical symptoms, accessibility issues, and discrimination due to persistent criminal activity and the lack of functional safety features at the Property. *See Lombard v. Colo. Outdoor Educ. Ctr., Inc.,* 187 P.3d 565, 570 (Colo. 2008) (establishing causation as an element in premises liability claims).
- **Recklessness:** Defendants' failure to address these conditions despite repeated complaints and ample opportunity to remedy them constitutes gross negligence. Their actions deviated so far from the standard of care that they showed a blatant disregard for the safety and well-being of their tenants. *See Vigil v. Franklin,* 103 P.3d 322, 328 (Colo. 2004)

**Conclusion:**
- Defendants' gross negligence under the Premises Liability Act created hazardous conditions that led to significant harm for Plaintiffs physically, mentally, emotionally, financially, and in non-economic ways. Their reckless disregard for tenant safety demands compensatory and punitive/exemplary damages to hold them accountable and <u>deter similar conduct from the Defendants and **others like them**</u> in the future.

---

88. **CLAIM VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Elements:** Under Colorado law, Plaintiffs must prove:
- Defendants engaged in extreme and outrageous conduct.
- Defendants acted intentionally or recklessly.
- The conduct caused Plaintiffs severe emotional distress.

**Application:**
- Defendants' conduct, including harassment, threats, and failure to address dangerous conditions, was extreme and outrageous.
- Defendants acted intentionally to intimidate Plaintiffs.
- Plaintiffs experienced severe non-economic damages such as two years of unabated physical, emotional, and mental distress, including severely exacerbated physical disabilities, PTSD symptoms, and anxiety for fear of life and safety. *See Rugg v. McCarty,* 476 P.2d 753 (Colo. 1970).

**Conclusion:**
- Defendants' conduct, including harassment, threats, and the failure to address dangerous and uninhabitable conditions, constitutes intentional infliction of emotional distress under Colorado law. By engaging in extreme and outrageous behavior, acting intentionally or recklessly, and causing severe emotional harm, Defendants violated the rights and safety of Plaintiffs. As a result of this conduct, Plaintiffs suffered significant non-economic damages, including exacerbated physical disabilities, PTSD, and anxiety stemming from the constant fear for their life and safety. Plaintiffs respectfully request that this Court award compensatory and punitive damages, injunctive relief to prevent further emotional harm, and attorneys' fees and costs incurred in pursuing this action. Additionally, Plaintiffs seek any other relief deemed just and proper to address Defendants' egregious misconduct.

---

89. **CLAIM VIII: VIOLATIONS OF THE COLORADO CARES ACT (HOUSE BILLS 23-1095 AND 23-1254)**

**Elements:** Under the Colorado Cares Act, Plaintiffs must show:
- Plaintiffs qualify as tenants protected under the Act.
- Defendants violated the specific protections afforded by the Act, including retaliation and failure to remedy conditions.

**Application:**
- Plaintiffs qualify as tenants under the Colorado Cares Act.

- Defendants' retaliatory evictions and refusal to remedy dangerous habitability conditions violated the newly expanded and strengthened tenant protections under House Bills 23-1095 and 23-1254.

**Conclusion:**
- Defendants' actions, including retaliatory evictions, refusal to remedy dangerous habitability conditions, and failure to comply with the protections afforded to tenants under the Colorado Cares Act, directly violated House Bills 23-1095 and 23-1254. These violations deprived Plaintiffs of the rights and safety guaranteed under Colorado law, causing significant economic and emotional harm. Plaintiffs respectfully request compensatory and punitive damages, statutory damages as permitted under the Act, injunctive relief to ensure Defendants' compliance with tenant protections, and attorneys' fees and costs. Plaintiffs also seek any further relief deemed just and proper to address Defendants' violations and safeguard the rights of all tenants.

90. **CLAIM IX: CRIMINAL NEGLIGENCE THROUGH THE PREMISES LIABILITY ACT (C.R.S. § 13-21-115)**

**Elements:** Under C.R.S. § 13-21-115, Plaintiffs must demonstrate:
1. Defendants owed a duty of care to Plaintiffs as tenants and lawful visitors to the property.
2. Defendants breached this duty through criminal negligence, defined as a failure to perceive a substantial and unjustifiable risk that constitutes a gross deviation from the standard of care.
3. The breach directly caused Plaintiffs' injuries or damages.

**Application:**
1. **Duty of Care:** Defendants, as property owners and managers, owed a statutory duty to maintain the Property in a reasonably safe condition, ensuring that tenants and their guests were not exposed to foreseeable harm. *See Springer v. City & County of Denver,* 13 P.3d 794, 799 (Colo. 2000).
2. **Breach of Duty:** Defendants acted with criminal negligence by:
   o Persistently ignoring tenant complaints about life-threatening conditions, including broken locks, non-functional elevators, and inadequate lighting in common areas, despite being notified repeatedly.
   o Failing to remedy hazardous situations such as mold infestations, sewage backups, and pest control issues, which posed substantial health risks.
   o Creating conditions that enabled criminal activity, including violent assaults and theft, through a lack of basic security measures and functional infrastructure.
   o Plaintiffs suffered assaults, injuries, and ongoing threats to their safety. *See Slaven v. BP Am., Inc.,* 973 P.2d 1234 (Colo. App. 1999).

For instance, Plaintiffs Katie Johnson, and Jessica Busby were assaulted and experienced other severe criminal activity such as break-ins, car thefts, being held at gunpoint, etc. due to Defendants' failure to repair broken locks, address security concerns, or do anything about plaintiffs' complaints of organized criminal activity and specific, credible threats to their life and safety from neighbors, allowing unauthorized individuals to enter the premises, etc. This risk was both substantial and unjustifiable, and Defendants' inaction constituted a gross deviation from the standard of care expected of property managers.

3. **Causation and Damages:** The hazardous conditions directly caused physical and emotional injuries to Plaintiffs. Plaintiffs Katie Johnson, and Jessica Busby for example, experienced exacerbated PTSD and other medical symptoms with severe mental and emotional distress due to the pervasive criminal activity and unsafe environment. *See Lombard v. Colo. Outdoor Educ. Ctr., Inc.,* 187 P.3d 565, 570 (Colo. 2008) (establishing causation as an element in premises liability claims).

4. **Substantial and Unjustifiable Risk:** Defendants failed to perceive the obvious and significant risks posed by the dangerous conditions at the Property. This failure demonstrates a gross deviation from the reasonable standard of care, amounting to criminal negligence. *See People v. Hall,* 999 P.2d 207 (Colo. 2000).

**Conclusion:**
- Defendants' criminal negligence under the Premises Liability Act created hazardous conditions that resulted in significant harm to Plaintiffs. Their failure to address these risks, despite repeated opportunities to do so, warrants compensatory and punitive damages to hold them accountable and prevent similar conduct in the future.

## 91. CLAIM X: BREACH OF LEASE AGREEMENTS

**Elements:** Under Colorado law, Plaintiffs must prove:
- A valid lease agreement existed.
- Defendants materially breached the terms of the lease.
- Plaintiffs suffered damages because of the breach

**Application:**
- Plaintiffs signed leases requiring Defendants to maintain safe and habitable conditions, abide by all federal, state, and local law, and not to retaliate against Plaintiffs.
- Defendants breached the lease terms by allowing dangerous and uninhabitable conditions to persist, by violating federal, state, and local law in multiple capacities, and by retaliating against plaintiffs for formally notifying, or complaining to city officials about, and eventually suing defendants for their persistent, wanton, and illegal conduct.
- Plaintiffs incurred damages, including medical expenses, relocation costs, non-economic damages and loss of property value

**Conclusion:**
- Defendants' material breaches of the lease agreements, including their failure to maintain safe and habitable conditions, violations of federal, state, and local law, and retaliatory actions against Plaintiffs, directly deprived Plaintiffs of the benefits guaranteed under their contracts. These breaches caused Plaintiffs substantial damages, including medical expenses, relocation costs, non-economic harm, and loss of property value. Plaintiffs respectfully request compensatory damages, punitive damages to deter further violations, injunctive relief requiring Defendants' compliance with lease obligations, attorneys' fees, and other relief deemed just and equitable by the Court.

## 92. CLAIM XI: VIOLATIONS OF THE COLORADO ANTI-DISCRIMINATION ACT (C.R.S. §§ 24-34-601 et seq.)

**Elements:** Under C.R.S. §§ 24-34-601 et seq., Plaintiffs must demonstrate:
1. Plaintiffs are members of a protected class under the Colorado Anti-Discrimination Act (CADA).
2. Defendants engaged in discriminatory practices that denied Plaintiffs equal enjoyment of housing facilities.
3. The discriminatory actions were intentional or had a disparate impact on Plaintiffs due to their protected status.

**Application:**
1. **Protected Class:** Plaintiffs Katie Johnson, and Jessica Busby are protected under CADA due to their documented disabilities, including mobility impairments and PTSD. The statute explicitly protects individuals with disabilities from discrimination in public accommodations and housing facilities.
2. **Discriminatory Practices:** Defendants engaged in discriminatory practices by:
   - Failing to maintain functional elevators and accessible entryways despite knowing these were critical for disabled Plaintiffs to access their homes.

   o  Ignoring specific accommodation requests submitted in writing by Plaintiffs, including timely elevator repairs and modifications to address ADA compliance.
   o  Treating complaints from disabled tenants with deliberate indifference while prioritizing maintenance issues affecting non-disabled tenants.

3. **Disparate Impact:** The lack of functional safety features and inaccessible facilities disproportionately impacted Plaintiffs with disabilities, as these conditions exacerbated their medical conditions and restricted their ability to live independently. For example, Ms. Johnson, and Ms. Busby were forced to navigate unsafe stairwells, risking injury, while Ms. Johnson, and Ms. Busby's PTSD and other medical conditions were aggravated by the stress of inaccessible and extremely unsafe living conditions. *See Brooke v. Rest. Servs., Inc.*, 906 F.3d 1185, 1190 (10th Cir. 2018) (addressing disparate impact claims under anti-discrimination statutes).

4. **Intentional Conduct:** Defendants' repeated refusal to address these issues, despite knowing the significant impact on Plaintiffs' health and safety, demonstrates intentional discrimination. See C.R.S. § 24-34-601(2) (prohibiting intentional acts of discrimination against individuals with disabilities).

**Conclusion:**
- Defendants' violations of the Colorado Anti-Discrimination Act caused substantial harm to Plaintiffs by denying them equal access to safe and habitable housing. Plaintiffs request compensatory and punitive damages, along with injunctive relief, to ensure compliance with CADA and to prevent further discrimination.

---

93. **CLAIM XII: VIOLATIONS OF THE FALSE CLAIMS ACT (31 U.S.C. §§ 3729-3733)**
Defendants received federal housing subsidies (e.g., Section 8) and failed to comply with federal housing standards, plaintiffs may bring a qui tam action under the FCA.

**Elements:**
1. Defendants knowingly submitted false claims to the government.
2. These false claims resulted in payment of federal funds.
3. Plaintiffs, as whistleblowers, suffered harm.

**Supporting Case Law:**
- *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016): Clarifies the materiality standard under the FCA.

**Conclusion:**
- Defendants knowingly submitted false claims to the federal government regarding their compliance with housing standards while receiving federal subsidies, including Section 8 funding. These misrepresentations directly violated the False Claims Act and resulted in the misuse of taxpayer funds, depriving Plaintiffs and other tenants of safe and habitable living conditions. Plaintiffs, as whistleblowers, suffered economic and emotional harm due to Defendants' fraudulent practices. Plaintiffs respectfully request compensatory and punitive damages, statutory damages under the False Claims Act, injunctive relief to prevent further violations, and attorneys' fees and costs. Plaintiffs further seek any additional relief deemed just and proper to address Defendants' egregious misconduct.

---

94. **CLAIM XIII: VIOLATIONS OF THE DENVER MUNICIPAL CODE ON HEALTH AND SAFETY**
**Elements:** Under the Denver Municipal Code § 24-16, property owners must maintain premises free from health hazards, ensuring compliance with local ordinances on safety and sanitation.

**Application:**
- Defendants violated the Denver Municipal Code by failing to address health hazards, including:
   o  Persistent mold growth in tenant units, violating sanitation requirements.

- o Inadequate waste management, leading to pest infestations, trash piled as high as people left to fester for days in common areas, uninhabitable and hazardous conditions.
- o Failure to provide functional heating and cooling systems, reliably running water, or to address rampant fire hazards stemming from these conditions jeopardizing tenant health and safety during extreme weather conditions for weeks or months on end.
- These violations created dangerous living conditions that significantly impacted Plaintiffs' health and safety. For instance, Plaintiffs experienced respiratory issues aggravated by mold, and Defendants failed to remediate despite repeated notifications.

**Conclusion:**
- Defendants' failure to address health hazards, including persistent mold growth, inadequate waste management, and failure to provide functional heating, cooling, and fire safety measures, constitutes violations of the Denver Municipal Code § 24-16. These conditions jeopardized Plaintiffs' health and safety, leading to significant physical, emotional, and economic harm. Plaintiffs respectfully request compensatory damages, injunctive relief to ensure compliance with health and safety standards, punitive damages to deter future violations, attorneys' fees, and any other relief deemed just and equitable by the Court.

95. **CLAIM XIV: BREACHES OF DENVER FIRE CODES**
**Elements:** Plaintiffs must demonstrate that Defendants violated provisions of the Denver Fire Code (DFC), which incorporates the International Fire Code (IFC) and mandates the maintenance of fire safety systems and prevention of fire hazards.
**Application:**
1. **Failure to Maintain Fire Safety Systems:** Defendants failed to ensure the operability of fire alarms, sprinklers, and other life-saving systems mandated by the DFC. Plaintiffs observed and reported non-functional smoke detectors and fire extinguishers, which were not replaced or repaired despite multiple requests. *See* DFC § 907.20.5 (requiring maintenance of fire detection systems).
2. **Blocked Exits and Egress Violations:** Defendants allowed emergency exits and pathways to remain obstructed by debris, violating DFC § 1031.3, which mandates that all exits always be free from obstructions and accessible. Plaintiffs Katie Johnson, and Jessica Busby documented several instances where emergency exits were blocked, endangering tenants during fire drills and emergencies.
3. **Failure to Address Combustible Hazards:** Defendants ignored complaints about stored flammable materials in common areas, violating DFC § 305.1, which prohibits the accumulation of combustible materials. These hazards posed an imminent fire risk, as evidenced by multiple tenant complaints.
4. **Inadequate Fire Drills and Evacuation Plans:** Defendants failed to conduct required fire drills or post evacuation plans, violating DFC § 404.3. This neglect left Plaintiffs uninformed about safety protocols, creating confusion during fire alarms.
5. **Causation and Damages:** The Defendants' breaches of fire safety codes created an unreasonably dangerous environment, placing Plaintiffs at risk of injury or death. For example, Plaintiffs Katie Johnson, and Jessica Busby experienced severe anxiety due to the persistent fire hazards and lack of proper safety measures.

**Supporting Statutory and Municipal Authority:**
- Denver Fire Code §§ 1031.3, 305.1, 404.3, 907.20.5.
- International Fire Code (incorporated by reference).
- Colorado Revised Statutes (C.R.S.) § 13-21-115 (Premises Liability Act).

**Conclusion:**

- Defendants' repeated breaches of the Denver Fire Code created hazardous living conditions that endangered Plaintiffs' lives. Their failure to comply with fire safety regulations demonstrates gross negligence, warranting compensatory, punitive, and injunctive relief to ensure tenant safety and prevent future violations.

96. **CLAIM XV: BREACHES OF IMPLIED COVENANT OF QUIET ENJOYMENT**
**Elements:** Under Colorado common law, every lease includes an implied covenant ensuring tenants' peaceful and quiet enjoyment of their rental premises.
**Application:**
1. Plaintiffs' enjoyment of their units was repeatedly disrupted by Defendants' failure to address:
   o Excessive noise and criminal activity, including gang-related incidents and violent assaults.
   o Frequent utility outages and unsafe conditions in common areas, such as broken locks and inadequate lighting.
2. Defendants' inaction in response to these issues effectively deprived Plaintiffs of their right to peacefully occupy their homes.
**Conclusion:**
- Defendants' persistent failures to address excessive noise, criminal activity, frequent utility outages, and unsafe common areas such as broken locks and inadequate lighting deprived Plaintiffs of their right to quiet enjoyment under Colorado common law. These actions caused Plaintiffs significant emotional distress, loss of safety, and disruption to their daily lives. Plaintiffs respectfully request compensatory damages, punitive damages to deter future breaches, injunctive relief to ensure Defendants' compliance with their legal obligations, and attorneys' fees. Plaintiffs also seek any additional relief deemed just and equitable to address the harm caused by Defendants' violations.

97. **CLAIM XVI: NEGLIGENCE PER SE FOR VIOLATIONS OF BUILDING AND HOUSING CODES**
**Elements:** Plaintiffs must demonstrate:
1. A statute or ordinance was violated.
2. The statute was designed to protect against the type of harm suffered.
3. The violation caused Plaintiffs' injuries.
**Application:**
1. Defendants violated applicable building and housing codes, including:
   o Failure to maintain functional elevators in violation of accessibility standards.
   o Failure to address structural issues, such as leaking ceilings and broken doors, in violation of safety codes.
2. These violations caused Plaintiffs' injuries, including physical harm from unsafe conditions and emotional distress from persistent hazards. For example, Plaintiffs mobility was severely limited due to non-functional elevators, forcing them to use unsafe stairs.
**Conclusion:**
- Defendants' violations of applicable building and housing codes, including their failure to maintain functional elevators, address structural issues, and resolve safety hazards such as leaking ceilings and broken doors, directly caused Plaintiffs' injuries. These actions created unsafe living conditions and significantly impacted Plaintiffs' physical and emotional well-being. Plaintiffs respectfully request compensatory damages, punitive damages to deter further code violations, injunctive relief to ensure compliance with safety standards, attorneys' fees, and any other relief deemed just and equitable by the Court.

98. **CLAIM XVII: VIOLATIONS OF COLORADO'S IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

**Elements:** Under Colorado law, property must be suitable for the intended purpose of residential habitation.

**Application:**

1. Defendants breached this warranty by allowing conditions to persist that rendered the Property unfit for habitation, including:
   - o Hazardous environmental conditions, such as sewage backups and mold.
   - o Security failures, such as broken locks and inadequate lighting, which exposed tenants to the organized criminal activity using the unsecured property as a base of operations for criminal activity.
2. Plaintiffs were directly impacted by these breaches, suffering severe financial and non-economic harms.

**Conclusion:**

- Defendants' failure to maintain the Property in a condition suitable for residential habitation constitutes a violation of Colorado's Implied Warranty of Fitness for a Particular Purpose. Persistent hazardous conditions such as sewage backups, mold growth, and security failures rendered the Property unfit for its intended purpose, directly causing Plaintiffs' financial, physical, and emotional harm. Plaintiffs respectfully request compensatory and punitive damages, injunctive relief requiring compliance with fitness standards, attorneys' fees, and any additional relief deemed just and equitable by the Court.

99. **CLAIM XVIII: VIOLATIONS OF THE COLORADO COMMON INTEREST OWNERSHIP ACT (C.R.S. §§ 38-33.3-101 ET SEQ.)**

**Elements:** If the property is governed under a homeowners' association (HOA), this statute imposes fiduciary duties on property managers and owners.

**Application:**

1. Defendants failed to fulfill fiduciary duties by neglecting maintenance and safety obligations, resulting in harm to Plaintiffs.
2. These failures constituted a breach of statutory duties under the Colorado Common Interest Ownership Act, contributing to hazardous living conditions.

**Conclusion:**

- The violations described above demonstrate Defendants' systemic disregard for legal obligations and tenant safety, warranting additional compensatory, statutory, and punitive damages to remedy Plaintiffs' harms and prevent future violations.

100. **CLAIM XIX: VIOLATIONS OF THE COLORADO RENTAL FAIRNESS ACT (C.R.S. § 38-12-801 ET SEQ.)**

**Elements:**

1. Landlords are prohibited from including lease terms that waive tenant rights or remedies afforded by law (C.R.S. § 38-12-801).
2. Fees or penalties imposed must not be excessive or unreasonable (C.R.S. § 38-12-802).
3. Landlords cannot retaliate against tenants for asserting their legal rights (C.R.S. § 38-12-509).
4. Landlords must provide clear, transparent lease terms and adequate notice of any changes or penalties.

**Application:**

1. Defendants included or enforced lease terms that violated the Warranty of Habitability by failing to address severe issues such as mold, pest infestations, and security failures.
   - o Plaintiffs were misled into believing they could not pursue remedies for habitability violations due to omissions or misrepresentations in lease agreements.

2. Defendants imposed retaliatory rent increases and excessive fees following Plaintiffs' documented complaints about habitability and security concerns.
   - o Late fees and penalties were levied without proper notice or justification, creating financial hardship for Plaintiffs.

3. Defendants retaliated against Plaintiffs by refusing to renew leases for tenants in good standing, obstructing access to lease records, and creating hostile living conditions.
   - o Examples include requiring tenants to document issues themselves instead of addressing them and fabricating lease expirations or other documents or making changes to ledgers to "push" or force tenant relocation.

4. Defendants failed to provide transparency and adequate notice regarding lease changes, rent increases, and penalties, causing confusion and distress for tenants.
   - o Communications demonstrate Defendants' failure to adhere to statutory requirements for transparency.

**Conclusion:**
- Defendants' violations of the Colorado Rental Fairness Act caused significant harm to Plaintiffs, including economic losses, emotional distress, and unsafe living conditions. Plaintiffs seek compensatory damages, statutory damages, injunctive relief, and any additional remedies deemed just and equitable to address these violations and prevent future misconduct.

## 101. CLAIM XX: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

**Elements:**
In Colorado, the covenant of good faith and fair dealing is implied in every contract and requires that neither party engage in conduct that will deprive the other party of the benefits of the contract. Defendants, as landlords, were obligated to act in good faith to ensure Plaintiffs' use and enjoyment of the leased premises.

**Application:**
Defendants breached the covenant of good faith and fair dealing through the following actions:

1. **Habitability Violations**:
   - o Persistent failure to address raw sewage backups, trash accumulation, pest infestations, and other habitability issues deprived Plaintiffs of a safe and livable home, violating the implied covenant.

2. **Retaliatory Conduct**:
   - o Defendants issued retaliatory notices, such as cease-and-desist letters and eviction threats, aimed at intimidating Plaintiffs and discouraging them from reporting unsafe conditions and enforcing their rights under the lease agreements.
   - o The placement of disruptive tenants near Plaintiffs' units was an intentional act to interfere with their quiet enjoyment of the property.

3. **Neglect of Security**:
   - o Defendants neglected to repair broken security doors, failed to implement adequate security measures, and allowed criminal activity to proliferate, creating unsafe conditions that undermined Plaintiffs' use and enjoyment of their leased premises.

4. **Failure to Address Maintenance Requests**:
   - o Repeated disregard of maintenance requests, including for non-functional elevators, raw sewage issues, and fire alarm malfunctions, hindered Plaintiffs from fully benefiting from their leases.

5. **Unreasonable Restrictions**:
   - o Defendants prohibited Plaintiffs from entering the management office or communicating with staff under threat of eviction, which directly obstructed their ability to address critical habitability issues and enforce his rights under the lease.

**Conclusion:**

- Defendants' actions constitute a breach of the covenant of good faith and fair dealing, depriving Plaintiffs of the full benefits of their lease agreements and causing substantial harm. Plaintiffs respectfully request that the Court grant the relief sought to redress Defendants' misconduct and prevent further harm to tenants.

## 102. CLAIM XXI: UNJUST ENRICHMENT

**Elements:**

Under Colorado law, a claim for unjust enrichment requires Plaintiffs to show:

1. Defendants received a benefit.
2. Defendants retained the benefit at Plaintiffs' expense.
3. Retention of the benefit would be unjust under the circumstances.

**Application:**

1. Benefit Received:
   o Defendants received substantial financial benefits, including rent payments and federal subsidies, while failing to maintain habitable living conditions in compliance with state and local laws.
2. At Plaintiffs' Expense:
   o Plaintiffs paid full rent and incurred additional expenses for repairs, pest control, medical treatment, and relocation due to Defendants' gross negligence and intentional misconduct.
   o Defendants failed to fulfill their contractual and statutory obligations, forcing Plaintiffs to bear costs for unaddressed maintenance and safety issues.
3. Unjust Retention:
   o Retaining these benefits is unjust as Defendants knowingly allowed hazardous conditions, including sewage backups, mold infestations, and inadequate security, to persist while continuing to collect rent and federal subsidies.
   o The conditions directly harmed Plaintiffs physically, emotionally, and financially.

**Conclusion:**

- Defendants were unjustly enriched by collecting rent payments and subsidies while failing to provide habitable living conditions or address known safety and maintenance issues. Plaintiffs respectfully request restitution of rent payments made during periods of uninhabitable conditions; compensatory damages for out-of-pocket expenses and non-economic harm; punitive damages to deter Defendants from engaging in similar misconduct; attorneys' fees and costs; any additional relief deemed just and equitable by the Court.

## 103. CLAIM XXII: VIOLATION OF C.R.S. § 38-12-103 (SECURITY DEPOSITS)

**Elements:**

Under C.R.S. § 38-12-103, landlords must:

1. Return a tenant's security deposit within one month after the termination of the lease (or up to 60 days if specified in the lease).
2. Provide a written statement of deductions for any amount withheld.
3. Not withhold amounts beyond those necessary for unpaid rent, property damage beyond normal wear and tear, or other contractual obligations.

Failure to comply allows tenants to recover the security deposit, damages equal to three times the amount wrongfully withheld, and attorneys' fees.

**Application:**

1. **Defendants Failed to Return Security Deposits**:
   o Plaintiffs terminated their leases and fulfilled all contractual obligations, including providing proper notice and leaving their apartments in acceptable condition.

- o Defendants withheld Plaintiffs' security deposits without justification or failed to return them within the statutory timeframe.

2. **Defendants Failed to Provide Written Statements of Deductions**:
   - o Plaintiffs did not receive written statements itemizing deductions from their security deposits, as required under C.R.S. § 38-12-103(1).

3. **Unlawful Withholding**:
   - o Deductions made by Defendants were excessive, unsubstantiated, and beyond normal wear and tear or other contractual obligations.
   - o Defendants' failure to comply with statutory requirements was willful and in bad faith, warranting treble damages.

4. **Damages**:
   - o Plaintiffs suffered financial harm, including the loss of their security deposits and additional expenses incurred due to Defendants' unlawful conduct.

**Conclusion**:

- Defendants violated C.R.S. § 38-12-103 by failing to return Plaintiffs' security deposits, failing to provide required written statements of deductions, and unlawfully withholding amounts without justification. Plaintiffs respectfully request recovery of the wrongfully withheld security deposits. Treble damages as permitted under the statute; attorneys' fees and costs incurred in pursuing this claim; and any additional relief deemed just and equitable by the Court.

## 104. COUNT XXIII: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. §§ 1961-1968)

**Elements**:

1. Defendants participated in an enterprise.
2. The enterprise engaged in a pattern of racketeering activity.
3. Plaintiffs were injured by Defendants' actions.

**Application**:

- Defendants engaged in systemic fraud, including falsifying tenant records, suppressing complaints, and collecting federal subsidies under false pretenses.
- These actions constitute a pattern of racketeering activity affecting Plaintiffs and other tenants.

**Conclusion**:

- Defendants' conduct violated RICO by perpetuating systemic fraud and intimidation. Plaintiffs request compensatory damages, treble damages as allowed under RICO, punitive damages, and injunctive relief.

## 105. COUNT XXIV: NUISANCE (COMMON LAW AND DENVER MUNICIPAL CODE § 36-5)

**Elements**:

1. Defendants created or allowed a condition interfering with Plaintiffs' use of the premises.
2. The interference was substantial and unreasonable.

**Application**:

- Defendants maintained unsafe and unsanitary conditions, including trash accumulation, pest infestations, and criminal activity.
- These conditions disrupted Plaintiffs' quiet enjoyment and safety.

**Conclusion**:

- Defendants' actions constitute a nuisance under Colorado common law and municipal code. Plaintiffs request damages for emotional distress, injunctive relief, and punitive damages.

## 106. COUNT XXV: CONSTRUCTIVE EVICTION (COMMON LAW)

**Elements**:
1. Defendants rendered the premises uninhabitable.
2. Plaintiffs were forced to vacate or endured substantial interference.

**Application**:
- Defendants' failure to address habitability issues, including sewage backups and non-functional security doors, effectively evicted Plaintiffs from enjoying their premises.

**Conclusion**: Defendants' actions amount to constructive eviction. Plaintiffs request compensatory damages, non-economic damages, and punitive damages.

---

107. **COUNT XXVI: CIVIL CONSPIRACY (COMMON LAW)**

**Elements**:
1. Two or more persons agreed to engage in unlawful acts.
2. Plaintiffs suffered damages due to the acts.

**Application**:
- Defendants conspired to suppress complaints and retaliate against Plaintiffs by manipulating records, fabricating violations, and installing problematic tenants.

**Conclusion**:
- Defendants engaged in civil conspiracy to harm Plaintiffs. Plaintiffs request compensatory damages, punitive damages, and attorneys' fees.

---

108. **COUNT XXVII: UNFAIR OR DECEPTIVE PRACTICES IN REAL ESTATE TRANSACTIONS (C.R.S. § 6-1-105(1))**

**Elements**:
1. Defendants engaged in deceptive practices.
2. Plaintiffs relied on these practices and were harmed.

**Application**:
- Defendants falsely represented the habitability and safety of the property to tenants, inducing Plaintiffs to sign leases.

**Conclusion**:
- Defendants violated C.R.S. § 6-1-105(1). Plaintiffs request statutory damages, injunctive relief, and attorneys' fees.

---

109. **COUNT XXVIII: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) (15 U.S.C. §§ 1692-1692p)**

**Elements**:
1. Defendants engaged in prohibited debt collection practices.
2. Plaintiffs were harmed as a result.

**Application**:
- Defendants improperly charged fees, altered payment records, and fabricated debts, violating FDCPA provisions.

**Conclusion**:
- Defendants violated the FDCPA. Plaintiffs request statutory and compensatory damages, punitive damages, and attorneys' fees.

---

110. **COUNT XXIX: PROMISSORY ESTOPPEL (COMMON LAW)**

**Elements**:
1. Defendants made promises to Plaintiffs.
2. Plaintiffs reasonably relied on these promises to their detriment.

**Application**:
- Defendants promised safe and habitable conditions but failed to deliver, causing Plaintiffs to incur damages.

**Conclusion**:
- Defendants' actions constitute promissory estoppel. Plaintiffs request reliance damages and injunctive relief.

111. **COUNT XXX: INTENTIONAL MISREPRESENTATION OR FRAUD (COMMON LAW)**
**Elements**:
1. Defendants made false representations.
2. Plaintiffs relied on these representations and suffered harm.

**Application**:
- Defendants misrepresented the safety and condition of the property to Plaintiffs, inducing them to lease uninhabitable units.

**Conclusion**:
- Defendants engaged in fraud. Plaintiffs request compensatory and punitive damages, and attorneys' fees.

112. **COUNT XXXI: BREACH OF FIDUCIARY DUTY (COMMON LAW)**
**Elements**:
1. A fiduciary duty existed between Plaintiffs and Defendants.
2. Defendants breached this duty, causing harm.

**Application**:
- Defendants failed to act in Plaintiffs' best interests by prioritizing profits over safety and habitability.

**Conclusion**:
- Defendants breached their fiduciary duty. Plaintiffs request compensatory damages, punitive damages, and attorneys' fees.

## **SPECIFIC VIDEOS DEMONSTRATING CLEAR BREACH OF DUTIES**

113. **Dropbox and YouTube Channel as Evidence Repository:**
-Ms. Johnson, Ms. Busby, Mr. Haubenreiser and other residents have created and maintained a Dropbox and YouTube channel that serves as a repository of all evidence supporting their claims. This channel contains videos documenting the unsafe and uninhabitable conditions at Avantus Apartments, the failure of Asset Living, LLC to address these conditions, and the retaliatory actions taken against residents.

114. The Court is encouraged to review these videos as they provide clear, visual evidence of the defendants' violations. There is also a public dropbox available at https://www.dropbox.com/scl/fo/sui3blf5ynk39s4i8wusi/h?rl key=9wgiklrim0luzbotem9zm9kwc&st=91zfrad3&dl=0

115. **Sewage In Dwellings and Hazardous Conditions:**
- On April 29, 2023, residents Dan Miller and his wife and son, the Wilhours reported raw sewage backing up into their bathtub. Despite contacting the emergency maintenance line over 15 times, no action was taken until days later, forcing Plaintiffs to physically move raw sewage between their bathtubs. This hazardous condition persisted, with sewage flowing from the toilet and bathtub, causing unbearable stench and health risks for more than a week. Videos documenting these events are available at the following link: [https://youtu.be/wGF8Gfc8sIM].

116. **Elevator Failures and Accessibility Issues:**
- Elevators frequently broke down, including during times when they were crucial for disabled residents like Ms. Johnson, Ms. Busby, and Mr. Haubenreiser. Throughout the period of January 2021 through present Ms. Johnson, Ms. Busby, and their neighbor Mr. Haubenreiser encountered non-functional elevators at the Ulster building and Trenton building, severely limiting access and forcing residents to navigate dangerous conditions. The defendants' neglect in maintaining the elevators violated both the ADA and the Warranty of Habitability. Video documentation is available at [https://youtu.be/40I9MFkLA18].

## IX. DAMAGES AND PRAYER FOR RELIEF

117. Given the severity and ongoing nature of the damages caused by the defendants' actions, the plaintiffs seek the following relief:

118. **Compensatory Damages:**
  - Physical, Emotional, and Mental Distress: Compensation for the severe physical, emotional, and mental distress caused by the defendants' negligence, for over two years, including the exacerbation of Ms. Johnson, and Ms. Busby's existing disabilities due to lack of elevator access and exposure to unsafe conditions such as sewage backups, pest infestations, and criminal assaults. The distress suffered by Ms. Johnson, Ms. Busby and other potential plaintiffs includes but is not limited to sleepless nights, anxiety, worsening of PTSD symptoms, fear for life and safety, inability to feel safe in one's own dwelling, and physical injuries aggravated by the defendants' willing or grossly negligent failure to maintain the elevators or premises in habitable, safe condition or to abate known, credible, specific, and imminent dangers to the Plaintiffs' life and safety.
  - Loss of Property Enjoyment: Compensation for the significant loss of enjoyment of the property, including the inability to use the apartment in a safe and comfortable manner. The plaintiffs were deprived of basic living conditions that should be guaranteed under Colorado's Warranty of Habitability, forcing them to endure conditions that were dangerous and unsanitary.
  - Medical Expenses: Reimbursement for any medical expenses incurred as a direct result of the defendants' negligence, including treatments for health conditions aggravated or caused by the unsafe living conditions, such as respiratory issues due to mold exposure, injuries related to the lack of functional elevators, and medical treatment required after the assaults on Ms. Johnson and Ms. Busby and their severe injuries.
  - Relocation Costs: Compensation for any costs associated with relocating to a safer environment, should the plaintiffs be forced to move due to the uninhabitable conditions created and maintained by the defendants. This includes moving expenses, lease termination fees, and any increased rent at a new location should the premises be closed by city officials.
  - Property Damage: Reimbursement for any personal property damaged or destroyed as a result of the defendants' negligence, such as furniture, clothing, or appliances or other property ruined by sewage backups, leaks, break-ins, or infestations.

119. **Punitive Damages:**
- Punitive damages to penalize the defendants for their willful and malicious conduct. The defendants' actions in ignoring repeated complaints, failing to provide basic living conditions, and retaliating against tenants demonstrate a blatant disregard for the law and the well-being of the plaintiffs. Punitive damages are necessary to deter such conduct in the future and to hold the defendants accountable for their actions. Money is the only thing that matters to national conglomerates mismanaging properties across the state and nation. Damages are the only thing they will pay attention to.

120. **Statutory and Treble Damages:**

- Pursuant to Colorado and Federal law, the plaintiffs seek treble damages as allowed under C.R.S. §§ 38-12-509 et seq.; C.R.S. § 38-12-103 et seq.; and (RICO) (18 U.S.C. §§ 1961-1968) due to the defendants' retaliatory and illegal actions. These damages are intended to multiply the plaintiffs' actual damages by three times to reflect the severity of the defendants' unlawful conduct.

### 121. Attorney Fees and Costs:

- An award for attorney fees (or time spent) and court costs incurred by the plaintiffs in pursuing this action. The plaintiffs have been forced to engage legal counsel due to the defendants' failure to address their lawful complaints and the retaliatory actions taken against them.

### 122. Declaratory and Injunctive Relief:

- A declaratory judgment affirming that the defendants violated Colorado's Warranty of Habitability, the ADA, FHAA, CADA, and the Colorado CARES Act, Et Al. Additionally, injunctive relief requiring the defendants to cease any further retaliatory actions and to take all necessary steps to remedy the damages caused by their past actions, including but not limited to providing financial compensation to the plaintiffs.

### 123. Prohibition Against Mismanaging Properties and Control of Property Given to Trustee:

- An order permanently prohibiting Asset Living, LLC and Abacus Capital from mismanaging any more residential properties within the State of Colorado. This measure is necessary to protect other tenants from the egregious conduct exhibited by the defendants in this case and to prevent further harm to vulnerable communities.

124. This would be the most important and meaningful step the court can take to stop the Defendant's malicious conduct.

### 125. Any Other Remedies Available Which the Plaintiffs Have Not Named, or Any Relief Deemed Appropriate by The Honorable Court:

- The plaintiffs request any other relief which the Plaintiffs may not have named or are unaware of, such as criminal sanctions, that the court deems just and equitable in light of the defendants' conduct and the severe harm suffered by the plaintiffs and to communities across the nation.

## X. CERTIFICATE OF SERVICE

126. We the Plaintiffs Katie Johnson, Jesica Busby, and other potential plaintiffs hereby certify that on 01/21/2025, a true and correct copy of this Complaint was served upon the Defendant via personal service and e-filing with the court.

## XI. VERIFICATION

127. We the Plaintiffs, Katie Johnson, Jessica Busby, and other potential plaintiffs hereby state and allege that the foregoing statements are true and correct to the best of our individual's knowledge and belief.

Dated: 01/21/2025

Signed:
Katie Johnson
Jessica Busby
---

## CERTIFICATE OF SERVICE

128. I hereby certify that on January 21st, 2025, a true and correct copy of the foregoing COMPLAINT OF SEVERE VIOLATIONS OF COLORADO'S WARRANTY OF

HABITABILITY PURSUANT TO C.R.S. §§ 38-12-501; LEASE AGREEMENTS; PROHIBITIONS AGAINST RETALIATION; THE COLORADO CARES ACT (HOUSE BILLS 23-1095 AND 23-1254); THE FAIR HOUSING AMENDMENTS ACT (FHAA); THE AMERICANS WITH DISABILITIES ACT (ADA); THE COLORADO CONSUMER PROTECTION ACT; GROSS AND CRIMINAL NEGLIGENCE THROUGH THE PREMISES LIABILITY ACT; AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, ET AL was filed with the Court and served via Colorado Courts E-Filing and that a courtesy copy was emailed to Defendant's counsel, registered agent, or by proper, lawful individual or substitute service at the following:

Issued by:
Katie Johnson
7738 E. 25th Ave.
Denver, CO 80238
Phone Number: 970-424-3399
Email: Katiemail82@gmail.com
Dated: 01/21/2025
*Katie Johnson*

Jessica Busby, *Pro Se*
3227 Syracuse St. #203
Denver, CO 80238
Phone Number: 720-329-6569
E-mail: BusbyJessica296@gmail.com
Dated: 01/21/2025
**Jessica Busby**

Issued to:
Counsel for Asset Living and Shanna Martinez
Richard L. Murray, Jr.
HALL & EVANS, LLC
1001 17th Street, Suite 300
Denver, CO 80202
Email: murrayr@hallevans.com

Michael G. Sarno and AMFP V Central Park
999 18th St., Suite 925N
Denver, CO, 80202
Phone: 720-379-1800
Email: Midwestacq@abacuscapitalgroup.com

Shanna Martinez
56303 E. 24th Pl.,
Strasburg, CO 80136
Phone: 303-802-0247

Counsel for Abacus Capital
Robert R. Marsh
Jester Gibson & Moore, LLP
303-339-4775

rmarsh@jgllp.com

The Mcgraths and Sako Partners
945 BUNKER HILL RD, FL 14.
Houston, TX 77024